Howard Shanker, Attorney General
P.O. Box 830
Sells, Arizona 85634
AZ Bar No. 015547
Howard.Shanker@tonation-nsn.gov
(520) 383-3410

*Attorney for the Tohono O'odham Nation*

Alexander B. Ritchie, Attorney General
P.O. Box 40
San Carlos, Arizona. 85550
AZ Bar No. 019579
alex.ritchie@scat-nsn.gov
(928) 475-3344

*Attorney for the San Carlos Apache Tribe*

William S. Eubanks II
Elizabeth L. Lewis
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
DC Bar No. 987036 (Mr. Eubanks)
DC Bar No. 229702 (Ms. Lewis)
bill@eubankslegal.com
lizzie@eubankslegal.com
(970) 703-6060

*Attorneys for Plaintiffs Center for Biological*
*Diversity and Archaeology Southwest*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
### TUCSON DIVISION

| | | |
|---|---|---|
| Tohono O'odham Nation; San Carlos Apache Tribe; Archaeology Southwest; and Center for Biological Diversity | ) ) ) | Case No. |
| | ) | **COMPLAINT FOR** |
| | **)** | **DECLARATORY JUDGMENT** |
| *Plaintiffs,* | ) | **AND INJUNCTIVE RELIEF** |
| | ) | |

1      v.                                    )
2                                            )
3   U.S. Department of the Interior; Deb Haaland,  )
4   *U.S. Secretary of Interior*; and U.S. Bureau of  )
5   Land Management;                        )
6                                            )
7                   *Defendants.*            )

**INTRODUCTION**

1.      This action challenges the Bureau of Land Management's ("BLM")
failure to comply with the National Historic Preservation Act ("NHPA"), 54
U.S.C. §§ 300101-307108, and the Administrative Procedure Act ("APA"), 5
U.S.C. §§ 701-706—as well as Executive Orders 13007 and 13175, Secretarial
Order 3403, and President Biden's November 30, 2022 Memorandum on
Uniform Standards for Tribal Consultation—in issuing its September 27, 2023
and November 27, 2023 Limited Notices to Proceed ("LNTP") to SunZia
Transmission, LLC, authorizing the partial construction of the SunZia Southwest
Transmission Project ("the Project"), a massive high-voltage transmission line
that will cut through the heart of the middle and lower San Pedro Valley and will
cause serious, irreversible adverse effects on Tribal cultural sites and sacred
areas, including areas with human remains. *See* 54 U.S.C. § 306108; 36 C.F.R.
§ 800.1(c).

2.      Despite repeated calls from Plaintiffs and others to conduct a
legally adequate inventory of historic properties and cultural resources that
would be impacted by the Project prior to the authorization of any construction
activities, BLM issued the LNTPs based on a deeply flawed NHPA Section 106
consultation process that failed to accurately locate and identify historic and
cultural resources. In particular, although Plaintiffs and others have submitted
overwhelming evidence of the cultural significance of the San Pedro Valley as a
cultural landscape to several Native American Tribes since 2009, BLM failed to
make a reasonable and good faith effort to identify the Valley as a traditional
cultural property until March 2023 at the earliest. In turn, the agency's
longstanding refusal to recognize this traditional cultural property corrupted the
entire Section 106 process, resulting in a severely limited, incomplete cultural
resource inventory that failed to identify historic sites in and around the San

Pedro Valley. Consequently, BLM's assertion in the LNTPs that "there are no historic properties present" within the construction footprint is factually and legally baseless, and Project construction authorized by the LNTPs has caused, and will continue to cause, serious, adverse effects to historic sites, including traditional cultural properties, in violation of the NHPA, its implementing regulations, and the APA.

3.      For these reasons and those set forth below, BLM's decision to issue the LNTPs authorizing construction in the San Pedro Valley and significant, irreversible impacts in one of our nation's most important historic and cultural regions without addressing these impacts in the manner required by the NHPA is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" and "without observance of procedure required by law," within the meaning of the judicial review provision of the APA, 5 U.S.C. § 706(2). Accordingly, BLM's LNTP should be vacated and remanded to the agency for further consideration.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to the APA, 5 U.S.C. §§ 701-706; 28 U.S.C. § 1331 (federal question jurisdiction), with claims arising under the APA and the NHPA. *See* 28 U.S.C. §1346 (United States as defendant); 28 U.S.C. § 1362 ("District courts shall have original jurisdiction of all civil actions, brought by any Indian Tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."). Plaintiffs have exhausted the available administrative remedies and have no other remedy at law.

5.      This action involves the United States as a defendant and arises under the laws of the United States. An actual, justiciable controversy exists

between the parties within the meaning of 28 U.S.C. § 2201(a). Jurisdiction is conferred by 28 U.S.C. § 1331. This Court may grant declaratory relief and additional relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.

6.     Venue is proper in this judicial district and Court pursuant to 28 U.S.C. § 1391(e)(1)(B) because a "substantial part of the events or omissions giving rise to the claim occurred" in this district, and a substantial part of the property that is the subject of this action is situated in this district. A large portion of the Project would be located in Arizona's San Pedro Valley. Venue is also proper in the Tucson Division pursuant to Civil Local Rules 77.1 and 5.1, because this case is founded on causes of action arising in the Tucson Division. A significant portion of the disputed Project is located in Pima County.

## PARTIES

7.     Plaintiff TOHONO O'ODHAM NATION is a federally-recognized Indian tribe with a governing body recognized by the Secretary of the Interior. In addition to the Tohono O'odham Nation's reservation lands, the Nation maintains deep historical, cultural, and spiritual connections to its broader ancestral territories including the San Pedro Valley. Many tribal members trace their lineage to the Sobaipuri O'odham, whose numerous villages along the San Pedro River were documented by the first Spanish conquistadors upon their arrival to the area in the early 1500s. Additionally, the Nation's tribal members are descendants of the Hohokam, the ancient people who previously lived and flourished along the rivers of Southern Arizona including the San Pedro River.  The Middle San Pedro Valley is a Traditional Cultural Landscape of the Tohono O'odham Nation and the many tribes whom they have shared this valley with for millennia.

8.     Plaintiff SAN CARLOS APACHE TRIBE is a federally-recognized Indian tribe, organized pursuant to Section 16 of the Indian Reorganization Act of

1934 (48 Stat. 984), with a governing body recognized by the Secretary of the

Interior. The San Carlos Apache Reservation ("Reservation") is situated in three

counties in eastern Arizona— Gila, Pinal, and Graham. The Reservation is a much

smaller portion of the larger aboriginal and ancestral homelands of the Tribe and

Western Apaches. The Tribe has a strong religious, historic, and cultural

connection to the lands and waters in the San Pedro Valley where the Project is to

be located and operated. Indeed, long before Anglo-Europeans appeared in the

western hemisphere, the Tribe's and its members' ancestors lived on the land in

the San Pedro Valley. The Project, its associated facilities, and connected activities

will occur within culturally sensitive and sacred areas of significance and

importance to the Tribe and the Tribe's members.

9. By filing this action, the Plaintiff Tribes do not waive their sovereign

immunity and do not consent to suit as to any claim, demand, offset, or cause of

action of the United States, its agencies, officers, agents, or any other person or

entity in this or any other court.

10. Plaintiff ARCHAEOLOGY SOUTHWEST is a 501(c)(3) nonprofit

organization headquartered in Tucson, Arizona. Founded in 1989, Archaeology

Southwest has over 2,000 members around the country.[1] For over three decades,

Archaeology Southwest has practiced a holistic, conservation-based approach to

exploring the places of the past—a concept it calls "Preservation Archaeology."

By exploring what makes a place unique and sharing this knowledge in innovative

---

[1] On January 1, 2012, the Center for Desert Archaeology changed its corporate name to Archaeology Southwest. No other aspect of the organization changed apart from the corporate name. As Archaeology Southwest informed BLM in its comments on the 2012 Draft Environmental Impact Statement ("EIS") for the Project, "[a]ny . . . correspondence submitted by the Center for Desert Archaeology should be considered information provided by Archaeology Southwest." Accordingly, for consistency and the convenience of the Court, this Complaint will use "Archaeology Southwest" throughout.

ways, Archaeology Southwest seeks to foster meaningful connections to the past and respectfully safeguard its irreplaceable resources. A key element of the Preservation Archaeology mission, therefore, is to connect the places and stories of the past to the people and values of the present. Archaeology Southwest achieves its mission by supporting low-impact research, educating the public about the invaluable archaeological resources within its study areas, and protecting historically inimitable places through conservation easements so that these places may be shared by future generations of Americans. Relevant here, Archaeology Southwest has sponsored and coordinated over a decade of intensive cultural resource inventories, research, and Tribal and public engagement centered on the San Pedro Valley.

11.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit membership corporation with offices in Arizona, California, Colorado, Florida, Hawaii, Minnesota, Nevada, North Carolina, Oregon, Washington, Washington D.C., and Mexico. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in species and habitat protection issues worldwide, including throughout the southwestern United States, and actively advocates for increased protections for species and their habitats and landscape connectivity in Arizona and specifically in the San Pedro Valley. The Center works to support preservation of indigenous cultural landscapes and traditional cultural properties as well as other historic properties to benefit human welfare which is deeply linked to nature, wildlife, and habitat.

12.     Clearing, grading, road construction, and other ground-disturbing activities are causing and will continue to cause adverse effects to historic properties of great cultural, spiritual, and religious significance to the Tohono O'odham Nation, San Carlos Apache Tribe, and their members, including

destruction of landscape integrity and connectivity that is harming, degrading, and adversely affecting important cultural values of this traditional cultural landscape. These activities are also causing the loss and displacement from the landscape of the native flora and fauna including many plants and animals sacred to the Tribes including tagging and relocation of saguaro cacti. Construction activities are also harming and will continue to harm sacred water resources including springs, seeps, and the San Pedro River itself by fundamentally changing the landscape structure and water flow across the landscape. Plaintiffs are harmed by the adverse effects to these historic properties, including the traditional cultural properties and indigenous and other historic properties in the San Pedro Valley. By transforming the landscape these activities are impairing the integrity of the cultural landscape for future generations. The operation of earth-moving equipment, the displacement of soils and boulders, and the killing of hundreds (and likely thousands) of plants and animals that are vital elements of the San Pedro Valley historic property are causing unmistakably significant, adverse effects and are radically diminishing the integrity of these historic resources. That these construction activities have been authorized without proper consultation and without affording the affected Tribes an opportunity to provide the ceremonial treatments that could have helped to avoid or reduce these impacts only exacerbated the on-the-ground injuries that are now occurring.



Figure 1: Aerial picture of new access roads and tower pad sites west of the San Pedro River, near Redrock Canyon. Photos taken by Archaeology Southwest with the support of a volunteer pilot and Lighthawk, a non-profit organization on November 13th, 2023, approximate coordinates: 32.17471, -110.34917.

13.     Plaintiffs' significant interests in historic, cultural, and indigenous resources in the San Pedro Valley will be irreparably harmed if construction proceeds under the LNTP due to irreversible damage to historic properties including traditional cultural properties, religious and cultural properties, and a major transformation of the indigenous cultural landscape.

14.     Plaintiffs' and their members' injuries would be redressed by the relief sought, which would vacate the LNTP, thereby halt construction, and require Defendants to comply with federal law prior to authorizing any further construction activities.

15.     Defendant DEB HAALAND, U.S. Secretary of Interior, is sued in her official capacity. As Secretary, she is charged with overseeing the management of the nation's lands within the jurisdiction of the Department of the Interior and its agencies, including BLM, as well as the Department of the

Interior's and its agencies' compliance with NHPA. The Secretary is further charged with implementing statutes, regulations, and Executive Orders and is responsible for government-to-government consultation with Indian tribes and pursuant to the NHPA, 54 U.S.C. §§ 306102, 302706, 36 CFR § 800.2(c)(2)(ii), and Executive Orders 13007 and 13175.

16. Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is responsible for the administration and implementation of the NHPA in its undertakings and for compliance with all other federal laws applicable to agencies within the Department of the Interior, including BLM.

17. Defendant BUREAU OF LAND MANAGEMENT is a federal agency within the Department of the Interior charged with the management of certain public lands and has legal responsibility for ensuring that its actions comply with the NHPA and other laws. BLM issued the LNTP to SunZia at issue in this case, as well as other decisions and documents referenced herein. BLM has an obligation to consult and coordinate with the TOHONO O'ODHAM NATION, the SAN CARLOS APACHE TRIBE, the HOPI TRIBE, and the ZUNI PUEBLO and other governmental units when making findings and determinations under Section 106 of the NHPA regarding the effects of BLM-approved projects on cultural resources. Importantly, BLM has a fiduciary duty under the federal trust responsibility to consult and coordinate with the Tribes and protect the Tribes' properties, including traditional cultural properties, sacred sites, and cultural items (term from NAGPRA, if included) when approving and assessing the effects of projects.

## STATUTORY BACKGROUND

### A.    NHPA

18. Congress enacted the NHPA in 1966, with the express intent that "the historical and cultural foundations of the nation should be preserved as a

living part of our community life and development in order to give a sense of orientation to the American People." Pub. L. 89-665, 80 Stat. 915 (1966).

19.     Section 106 of the NHPA requires that federal agencies "take into account the effect" of any "undertaking" on historic properties. 54 U.S.C. § 306108. The term "undertaking" is broadly defined to mean "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency," and relevant here, expressly includes activities "requiring a federal permit, license, or approval." *Id.* § 300320; *accord* 36 C.F.R. § 800.16(y). "Historic property" is likewise broadly defined to include "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register, including artifacts, records, and material remains relating to the district, site, building, structure, or object." 54 U.S.C. § 300308.

20.     The NHPA also established the Advisory Council on Historic Preservation ("ACHP"), an independent agency with the authority to issue binding regulations to implement Section 106. *Id.* §§ 304101-304102. Relevant here, those regulations provide that agencies "must complete the Section 106 process *prior to* the approval of . . . the undertaking or *prior to* the issuance of any license." 36 C.F.R. § 800.1(c) (emphases added). Although agencies may authorize "nondestructive project planning activities before completing compliance with section 106," they may only do so where "such actions do not restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties." *Id.* § 800.1(c). Agencies must also "ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking." *Id.*; *see also id.* § 800.2 (noting that consultation on historic properties of significance to Native American tribes

1    "should commence early in the planning process, in order to identify and discuss

2    relevant preservation issues and resolve concerns about the confidentiality of

3    information on historic properties").

4         21.    Incorporating the knowledge, views, and expertise of Native

5    American Tribes is central to the NHPA and its Section 106 process. Indeed, the

6    Section 106 implementing regulations remind agencies of the "unique legal

7    relationship" between the federal government and "Indian tribes set forth in the

8    Constitution of the United States, treaties, statutes, and court decisions." *Id.* §

9    800.2. Accordingly, "[c]onsultation with Indian tribes should be conducted in a

10   sensitive manner respectful of tribal sovereignty," and further, "must recognize the

11   government-to-government relationship between the Federal Government and

12   Indian tribes." *Id.*  In particular, agencies:

13        [S]hall ensure that consultation in the section 106 process provides the
14        Indian tribe . . . a reasonable opportunity to identify its concerns about
15        historic properties, advise on the identification and evaluation of
16        historic properties, including those of traditional religious and cultural
17        importance, articulate its views on the undertaking's effects on such
18        properties, and participate in the resolution of adverse effects.

19   *Id.* The agency must "make a reasonable and good faith effort to identify Indian

20   tribes . . . that shall be consulted in the section 106 process, and "shall consult with

21   a representative designated by such Indian tribe . . . regarding undertakings

22   occurring on or affecting historic properties" of interest to the Tribe. *Id.*

23   Additionally, to ensure a meaningful process that recognizes the relationship

24   between the United States and Native American Tribes, "[c]onsultation should

25   commence early in the planning process, in order to identify and discuss relevant

26   preservation issues." *Id.*

27         22.    The Section 106 process requires agencies to "consult with any

28   Indian Tribe . . . that attaches religious or cultural significance" to historic

29   properties that may be affected by an undertaking. *Id.* § 800.4; *see also* 54 U.S.C.

§ 302706 (requiring agencies "in carrying out [their] responsibilities under [Section 106]," to "consult with any Indian tribe . . . that attaches religious and cultural significance to [historic properties that may be affected by the undertaking]"). Significantly, "[t]his requirement applies regardless of the location of the historic property." 36 C.F.R. § 800.4. In other words, consultation under Section 106 must occur regarding sites with "religious and cultural significance" even if they occur on ancestral or ceded land outside of a Tribe's reservation boundaries. *Id.*

23.  Agencies are also directed to "seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties, the likely interest of the public in the effects on historic properties, confidentiality concerns of private individuals and businesses, and the relationship of the Federal involvement to the undertaking." *Id.* § 800.2.

24.  Where an agency determines that an undertaking "has the potential to cause effects on historic properties," it must initiate the Section 106 process. *Id.* § 800.3. As part of that process, the agency must "[d]etermine and document the area of potential effects" ("APE") of the undertaking. *Id.* § 800.4(a)(1). The APE is defined by regulation to include the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties." *Id.* § 800.16(d). The size and scope of the APE "is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." *Id.* The agency must determine the APE in consultation with the State Historic Preservation Officer ("SHPO") and/or Tribal Historic Preservation Officer ("THPO"), and must proactively seek information about such sites from consulting parties, individuals or organizations "likely to

have knowledge of . . . historic properties in the area," including Tribes. *Id.*
§ 800.4.[2]

25.     Once the APE is delineated, the agency must "make a reasonable
and good faith effort" to identify historic properties within that area, in
consultation with the SHPO, THPO, and "any Indian tribe . . . that might attach
religious and cultural significance to properties within the area of potential
effects." 36 C.F.R. § 800.4(b). The agency must also identify properties within the
APE that have not been previously evaluated for eligibility for inclusion on the
National Register of Historic Places ("NRHP"), but nevertheless meet the criteria
for inclusion. *Id.* § 800.4(a)(4), (c). "Where alternatives under consideration
consist of corridors or large land areas . . . the [agency] may use a phased process
to conduct identification and evaluation efforts." *Id.* § 800.4(b)(2). Final
identification and evaluation of historic properties may also be deferred "if it is
specifically provided for" in a Programmatic Agreement or other appropriate
documentation as allowed under the regulations. *Id.* Under those circumstances,
the agency "should establish the likely presence of historic properties within the
[APE] for each alternative . . . through background research, consultation and an
appropriate level of field investigation," and taking into account the views of the
SHPO/THPO and other consulting parties. *Id.* The regulations require that the
agency "proceed with the identification and evaluation of historic properties" as
specific aspects of an alternative are "refined." *Id.*

26.     The NHPA authorizes the Secretary of the Interior to maintain the
NRHP as a list of "districts, sites, buildings, structures, and objects significant in

---

[2] Consulting parties include the State Historic Preservation Officer ("SHPO")
and/or the Tribal Historic Preservation Officer ("THPO"), if applicable. 36 C.F.R.
§ 800.2. Consulting party status is also awarded to Tribes where the undertaking
occurs on tribal land, or where the undertaking may affect culturally significant
sites. *Id.*

American history, architecture, archeology, engineering and culture." 36 C.F.R. § 60.1. "Site" is defined by regulation to broadly include "the location of a significant event, a prehistoric or historic occupation or activity, or a building or structure, whether standing, ruined, or vanished, where the location itself maintains historical or archeological value regardless of the value of any existing structure." *Id.* § 60.3. "Thus, a property may be defined as a 'site' as long as it was the location of a significant event or activity, regardless of whether the event or activity left any evidence of its occurrence." NAT'L PARK SERV., NAT'L REG. BULLETIN NO. 38, *Guidelines for Evaluating and Documenting Traditional Cultural Properties* 9 (1998) [hereinafter NAT'L REG. BULLETIN NO. 38]. Moreover, "[a] culturally significant natural landscape may be classified as a site, as may the specific location where significant traditional events, activities, or cultural observances have taken place." *Id.* Accordingly, traditional cultural properties—including culturally significant landscapes—are eligible for inclusion in the NRHP.

27.     A traditional cultural property is "defined generally as one that is eligible for inclusion in the [NRHP] because of its association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." *Id.* Such properties may include "traditional cultural landscapes," which are large-scale historic properties of religious and cultural significance to Native American Tribes, "comprised of multiple, linked features that form a cohesive 'landscape.'" ADVISORY COUNCIL ON HISTORIC PRES., NATIVE AMERICAN TRADITIONAL CULTURAL LANDSCAPES ACTION PLAN (2011).

28.     Once historic properties within the APE are identified, the agency must evaluate the historic significance of such sites and determine whether they are potentially eligible for listing under the NRHP. 36 C.F.R. § 800.4(c). When

"assessing the eligibility of historic properties that may possess religious and cultural significance" to Tribes, the agency must "acknowledge" the tribe's "special expertise." *Id.* Where the agency determines that a property meets the NRHP criteria and the SHPO/THPO agrees, "the property shall be considered eligible for the National Register for section 106 purposes." *Id.* Where the agency determines that the NRHP criteria are not met and the SHPO/THPO agrees, "the property shall be considered not eligible." *Id.* In the event of a disagreement between the agency and the SHPO/THPO, the agency must refer the determination to the Secretary of Interior. *Id.* "If an Indian tribe . . . that attaches religious and cultural significance to a property off tribal lands does not agree" with the agency's determination, "it may ask the [ACHP] to request the agency official to obtain a determination of eligibility" from the Secretary of Interior." *Id.*

29.     Where the agency identifies historic properties that may be affected by the undertaking, the agency must "notify all consulting parties, including Indian tribes . . . , [and] invite their views on the effects and assess adverse effects" of the undertaking on those properties. 36 C.F.R. § 800.4.

30.     Once historic properties that may be affected by the proposed undertaking are identified, the agency must, in consultation with the SHPO and/or THPO and "any Indian tribe . . . that attaches religious and cultural significance to identified historic properties," determine whether the undertaking with have "adverse effects" on the identified historic properties. *Id.* § 800.5. An adverse effect is defined by regulation to include "when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the [NRHP] in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* In making its determination, the agency must consider "all qualifying characteristics of a historic property, including those that may have

been identified subsequent to the original evaluation of the property's eligibility for the [NRHP]." *Id.* Significantly, "[a]dverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." *Id.*

31. If, as a result of the review of the undertaking's effects to historic properties, the agency determines that there will be no adverse effects, then the agency's NHPA obligations are fulfilled and it may move forward with authorization and implementation of the undertaking. However, "[i]f an adverse effect is found, the agency . . . shall consult further to resolve the adverse effect." *Id.* § 800.5.

32. To resolve adverse effects on historic properties, the agency must "consult with the SHPO/THPO and other consulting parties, including Indian tribes . . . , to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." 36 C.F.R. § 800.6. The ACHP may participate in this resolution process. *Id.* Where, as here, the ACHP elects to participate, and the agency, the SHPO/THPO, and the ACHP "agree on how the adverse effects will be resolved, they shall execute a memorandum of agreement." *Id.* This memorandum of agreement "evidences the agency['s] compliance with section 106 and [its implementing regulations] and shall govern the undertaking." *Id.* The agency shall ensure that the undertaking is carried out in accordance with the memorandum of agreement.

33. Relevant here, for "complex project situations," a memorandum of agreement may take the form of a "programmatic agreement." 36 C.F.R. § 800.14. Such agreements are suitable for "when effects on historic properties are similar and repetitive or are multi-State or regional in scope;" "when effects on historic properties cannot be fully determined prior to approval of an undertaking;" or

when "nonfederal parties are delegated major decision-making responsibilities," among other situations. *Id*. § 800.14(b)(1).

34.     The Section 106 implementing regulations identify three categories of signatories to programmatic agreements developed to address the potential adverse impacts of a complex project. First, the agency, SHPO/THPO, and ACHP are "signatories" and "have sole authority to execute, amend or terminate the agreement." 36 C.F.R. § 800.6. Second, the agency may invite additional parties, including any tribe that "attaches religious and cultural significance to historic properties located off tribal lands," to sign as "Invited Signatories." *Id.* These parties "have the same rights with regard to seeking amendment or termination" of the agreement as the signatories. *Id.* Finally, the agency may invite all consulting parties to sign as "Concurring Signatories." *Id.* The refusal of any Invited or Concurring Signatory to sign the agreement "does not invalidate" the agreement. *Id.*

**B.     Executive Orders 13007 And 13175 And Joint Secretarial Order 3403**

35.     Issued in May 1996, Executive Order 13007 provides that agencies responsible for managing federal lands "shall, to the extent practicable . . . accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and avoid adversely affecting the physical integrity of such sacred sites." The order defines "sacred site" to include "any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe . . . as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion."[3]

---

[3] The full text of Executive Order 13007 can be found on the Department of Interior's website. *See* https://www.doi.gov/pmb/cadr/programs/native/Executive-Order-13007.

36.     Issued in November 2000, Executive Order 13175 directed agencies to engage in meaningful government-to-government consultation with Native American Tribes, provide regulatory and statutory waivers to Tribes to increase flexible policy approaches at the Tribal level, and use consensual mechanisms for developing regulations on issues relating to Tribal self-government, Tribal trust resources, or Indian Tribal treaty and other rights.[4]

37.     In addition, Joint Secretarial Order 3403, issued by the Secretaries of Agriculture, Interior, and Commerce, built upon the two executive orders to further emphasize the need to "incorporat[e] Tribal expertise and Indigenous knowledge into Federal land and resources management." For example, the Order directed the Departments to "engage affected Indian Tribes in meaningful consultation at the earliest phases of planning and decision-making relating to the management of Federal lands to ensure that Tribes can shape the direction of management."[5]

C.      **Administrative Procedure Act**

42.     Under the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important

---

[4] The full text of Executive Order 13175 can be found on the Department of Interior's website. *See* https://www.doi.gov/pmb/cadr/programs/native/Executive-Order-13175.

[5] The full text of Joint Secretarial Order 3403 can be found on the Department of Interior's website. *See* https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3403-joint-secretarial-order-on-fulfilling-the-trust-responsibility-to-indian-tribes-in-the-stewardship-of-federal-lands-and-waters.pdf.

1  aspect of the problem, offered an explanation for its decision that runs counter to

2  the evidence before the agency," or if the agency's decision "is so implausible that

3  it could not be ascribed to a difference in view or the product of agency expertise."

4  *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

5  (1983).

6       43.    When reviewing agency action under the APA, the court must

7  ensure that the agency reviewed the relevant data and articulated a satisfactory

8  explanation establishing a "rational connection between the facts found and the

9  choice made." *State Farm*, 463 U.S. at 43. The agency's failure to do so renders its

10  decision arbitrary and capricious. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360,

11  378 (1989).

12  **FACTUAL BACKGROUND**

13
14  **I.**    **THE SAN PEDRO VALLEY AS A TRADITIONAL CULTURAL**
15         **PROPERTY**

16       44.    The historic and cultural importance of the San Pedro River Valley

17  to four different groups of people indigenous to the state of Arizona is well-

18  documented. Members of the Tohono O'odham, Hopi, Zuni, and Western Apache

19  tribes claim ancestral connections to the area. "While each group has its own

20  unique cultural landscapes with varied geographical areas and temporal ranges, the

21  San Pedro Valley is a common element linking them all." Roger Anyon et al.,

22  *Natural Setting as Cultural Landscapes: The Power of Place and Tradition*, 2005

23  USDA Forest Serv. Proceedings RMRS-P-36 273, *available at*

24  https://tinyurl.com/2s4vf9nu.

25       45.    The San Pedro Valley represents one of the most intact, prehistoric

26  and historical period, cultural landscapes in southern Arizona, if not the whole

27  Southwest. Cultural landscapes "are fashioned by cultural groups from the natural

28  environment" and thus, "encompass both the land itself and how individuals

perceive the land given their particular values and beliefs." *Id.* at 274. In other words, "[c]ultural landscapes are created and maintained by cultures that instill values, beliefs, and historical memory in the people belonging to a community," and as a result, "can be sustained for long periods without physical use." *Id.*

46.     The San Pedro Valley cultural landscape, like others, consists of multiple overlays of interwoven biophysical and sociocultural features and values that cohere in senses of place and belonging deeply felt by Indigenous people and communities. More than 10,000 years of tightly coupled human and natural history centered on and enabled by the perennial flow of the San Pedro River have made the Valley a perpetual home for many Tribes that possesses extraordinary cultural, religious, and archaeological significance.

47.     Significantly, the importance of the San Pedro Valley cultural landscape to the Tohono O'odham Nation and to Hopi, Zuni, and Western Apache tribes does not reside in isolated spots, but rather in the area as a whole. Accordingly, the entire cultural landscape is considered a "traditional cultural property." Such properties are "eligible for inclusion in the National Register because of [their] association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." NAT'L REG. BULLETIN NO. 38 at 1.

48.     BLM itself has recognized the significance of the San Pedro Valley to indigenous people. For example, in 2012, BLM and the United States Geological Survey (another agency within the Department of the Interior), issued a pilot study evaluating alternative methods and tools that quantify and value ecosystem services, using the San Pedro River Watershed as a case study. *See* Kenneth J. Bagstad et al., US GEOLOGICAL SURV., *Ecosystem Services Valuation to Support Decisionmaking on Public Lands—A Case Study of the San Pedro*

*River Watershed* 2012 Sci. Investigations Rep. 2012-5251, *available at*

https://tinyurl.com/4yycf756. The report explains that the "San Pedro River

watershed holds *immeasurable* significance to numerous American Indian tribes."

Kenneth J. Bagstad et al., *supra* at 54 (emphasis added); *see also id.* at 8

(explaining that the "San Pedro River watershed holds important spiritual and

cultural values, particularly for American Indian tribes with cultural or historic ties

to the watershed").

## II.      THE 2016 RIGHT-OF-WAY AUTHORIZATION PROCESS

49.     In 2008, SunZia Transmission, LLC submitted an application to

BLM for a right-of-way to construct and operate two new single-circuit overhead

500-kilovolt transmission lines originating at a new substation in Lincoln County,

New Mexico, and terminating at the Pinal Central Substation in Pinal County,

Arizona.

### A.      Initial Efforts To Inventory Cultural And Historic Resources

50.     BLM uses different types of surveys to evaluate areas for the

presence of cultural resources. A Class I survey is "a professionally prepared study

that includes a compilation and analysis of all reasonably available cultural

resource data and literature, and a management-focused, interpretative, narrative

overview, and synthesis of the data." BLM Manual, 8110—Identifying and

Evaluating Cultural Resources 8110.21A.1 (Rel.8–73, 12/03/04). A Class II

survey is a "probabilistic field survey" or "statistically based sample survey" that

"aid[s] in characterizing the probable density, diversity, and distribution of cultural

properties in an area." *Id.* 8110.21B.1. A Class III survey is an "[i]ntensive"

survey that involves "a professionally conducted, thorough pedestrian survey of an

entire target area ... intended to locate and record all historic properties" and that

"provides managers and cultural resource specialists with a complete record of

cultural properties." *Id.* 8110.21C.1, 8110.21C.3.

51.     In 2009, BLM began to inventory the cultural and historic resources that may be affected by the Project. BLM elected to use a "phased identification and evaluation" process, asserting that such an approach "is appropriate for projects where alternatives under consideration consist of corridors or large land areas."

52.     BLM first conducted a "Class I records review," which aimed to identify "prior inventories, research, and previously recorded sites within the study corridor, which was 1 mile from the edge of the 1,000-foot corridor for each alternative." According to BLM, "[t]his review resulted in an enormous amount of data, so results for an area within 0.25 mile of the Project centerline were analyzed." The Class I review thus "identified known cultural resource sites located within the 0.25-mile-wide study area, as well as significant cultural resources outside of the Class I study area that could be affected by the Project (such as historic trails, NRHP-listed sites and districts, and places of traditional cultural importance)."

53.     After the completion of the Class I review, BLM "completed a Class II judgmental sample inventory for all alternatives at selected locations known to be sensitive for cultural resources (i.e., river and historic trail crossings)." As a result of the Class II judgmental sample inventory, BLM estimated that a total of 188 historic and cultural sites would be impacted by the agency's preferred route alternative through the San Pedro Valley. According to BLM, "[s]eventy percent of the anticipated sites could have moderate to high sensitivity, which would require mitigation if impacted by Project construction."

54.     On information and belief, BLM did not identify the San Pedro Valley as a traditional cultural landscape, nor as a traditional cultural property, in either the Class I or Class II surveys.

**B.      Project Scoping And Initial Concerns With San Pedro Valley Route**

55.     On May 29, 2009, BLM published a notice of intent to prepare an Environmental Impact Statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347.

56.     Throughout the NEPA process, Plaintiffs and other organizations with considerable expertise in archaeology and cultural properties repeatedly alerted BLM to the presence of significant historic and cultural resources along the proposed transmission line route. Plaintiffs and others also raised concerns with respect to the significant adverse impacts that the proposed right-of-way and transmission line would indisputably have on the San Pedro Valley cultural landscape and historic sites therein. For example, in August 2009, Archaeology Southwest wrote to BLM to "express [its] concerns and recommendations regarding" the proposed transmission line. In particular, the organization informed BLM that "meaningful consideration of the potential direct, indirect, and cumulative impacts on historic and cultural resources and alternatives to avoid those impacts seems especially important for this proposal because BLM has already acknowledged that the project has the potential to affect '. . . visual resources, National Historic Trails and related viewsheds; Native American traditional cultural properties and sacred places.'" (quoting 74 Fed. Reg. 25,764 (May 29, 2009)).

57.     Archaeology Southwest urged BLM to accurately identify significant historic and cultural properties within the action area, particularly those within the San Pedro Valley. The letter explained that "[t]he San Pedro . . . drainage[] contain[s] near-complete records of 12,000 years of past human activity, including both Native American and Euro-American." This "scale of regional preservation provides an opportunity to interpret sites as part of a broad

cultural and economic landscape rather than as isolated phenomena." Additionally, the "great time depth" permits the study of "changes in this human landscape over the full time span during which people have inhabited the New World." The scope and scale of the archaeological record underscores its value; the opportunity to study the entire cultural landscape over thousands of years is "no longer available in many Arizona valleys (e.g., Phoenix, Tucson, Safford) where agricultural and, subsequently, urban development destroyed much of the archaeological record before adequate documentation could take place." Additionally, the cultural landscape and non-renewable cultural resources it houses holds great value to "current and future stakeholders, including Native American groups, archaeologists, local residents and the interested public." Indeed, researchers "have identified over 500 archaeological sites in the lower San Pedro Valley," approximately one-third of which "contain architecture and probably human remains."

58.     Archaeology Southwest also urged BLM to consider alternatives to the proposed right-of-way that would avoid impacts to cultural and historic properties and resources. For example, the organization explained that "[e]very effort should be made to utilize" an existing right-of-way corridor to minimize— or even avoid—impacts to historic and cultural resources. The letter further asserted that BLM's preferred alternative "deviate[s] from the existing" corridor "without adequate justification."

59.     Archaeology Southwest further explained that "[e]arly and thorough consultation with Native American groups that may have connections to lands within and adjacent to the transmission line corridors is extremely important," and urged BLM to include "[a]n evaluation of potential physical, visual and social/psychological impacts to Native American [traditional cultural properties] and sacred landscapes . . . in the EIS." In particular, "[b]ecause [traditional cultural

1   properties] and sacred landscapes are highly susceptible to visual impacts, such as

2   from above-ground transmission lines, and because mitigating such impacts is

3   very difficult, BLM should attempt to resolve tribal concerns by avoiding

4   [traditional cultural properties] and sacred landscapes all together." The

5   organization explained that the preferred Project route in the lower San Pedro

6   Valley "could significantly impact a landscape of significance to Native American

7   groups." Archaeology Southwest thus informed BLM of the status of the San

8   Pedro Valley as a landscape of significance to Native American histories and

9   cultures—i.e., a traditional cultural landscape. To assist in the agency's

10  decisionmaking process, Archaeology Southwest offered to BLM its considerable

11  expertise and data regarding the locations, condition, and significance of

12  archaeological sites in the San Pedro Valley. The organization also offered to

13  "provide BLM with supplemental information about the relationship between

14  archaeological record of southern Arizona and the oral traditions of" the Akimel

15  O'odham, Tohono O'odham, Hopi and Zuni peoples.

16      60.     In November 2009, Archaeology Southwest submitted another letter

17  to BLM expressing its continued concerns about the route proposed for the

18  transmission project. The group again informed BLM of the cultural significance

19  of the San Pedro Valley and its intact cultural and natural landscape. The

20  organization noted that "[c]urrently, this largely unfragmented landscape contains

21  no major linear facility, so the potential physical and visual impacts of the

22  introduction of transmission lines of this size cannot be overstated." The letter

23  again urged BLM to consider alternative routes that minimized—or even

24  avoided—impacts to historic and cultural resources.

25      61.     By letter in June 2010, BLM informed Archaeology Southwest that

26  "[o]nce the preferred and alternative routes have been selected, the Section 106

process will be initiated." The agency assured the groups that "[t]his will take place *well before* the publication of a Draft [EIS]." (emphasis added).

62.     In June 2010, Archaeology again wrote to BLM to express its increasing alarm at the potential impacts that the proposed right-of-way grant would have on historic and cultural resources in the San Pedro Valley. In light of the information generated through the scoping process, the organizations argued that the impacts to cultural resources in this area would be "unacceptable under any 'mitigation' scenario," and "strongly encourage[d]" BLM to "drop th[is] alignment from further consideration."

63.     In August 2011, BLM abruptly reversed course and informed consulting parties that the Section 106 process would be initiated "[a]fter the Draft [EIS] is published."

**C.     The 2012 Draft EIS**

64.     In May 2012, BLM published its Draft EIS for public comment.

65.     In August 2012, Archaeology Southwest submitted comments on the Draft EIS notifying BLM of the agency's failure to comply with the Section 106 process. Agency guidance dictates that the NHPA process should be initiated prior to the NEPA scoping process so that the NHPA process can inform the development of alternatives under NEPA. *See* IM No. 2012-108. However, although the organization had been informed of its status as a consulting party by letter in August 2011, BLM had yet to provide any meaningful opportunity for input or discussion on the Project's impacts or alternatives. Nor had BLM given the Arizona SHPO "the opportunity to provide specific input to the identification of alternatives, selection of the draft preferred alternative, or the analysis of impacts to historic resources." Thus, the Draft EIS's range of alternatives— including the preferred alternative—was developed without the benefit of input from consulting parties and experts regarding impacts to cultural and historic

resources. The organization expressed its "concern[] that waiting until a final alternative is selected before beginning compliance with Section 106 will foreclose the opportunity of the [ACHP] to provide meaningful comments on the undertaking." Indeed, despite the agency's obligation under Section 106 to "develop and evaluate measures to 'avoid, minimize or mitigate' the adverse effects of their actions before finalizing such actions," BLM expressed its intention to "select a[n] . . . alternative before commencing NHPA compliance, effectively removing from consideration other siting alternatives that could 'avoid, minimize or mitigate' adverse effects on historic properties." The organization urged BLM to immediately comply with Section 106 to "ensure that BLM does not select a project alternative before Section 106 consultation, which would impermissibly foreclose alternatives, such as selecting a different route or route segments, to 'avoid, minimize or mitigate' the adverse effects of the project."

66.     In August 2012, the San Carlos Apache Tribe submitted comments on the Draft EIS expressing its "strenuous oppos[ition]" to BLM's preferred route for the Project. The San Carlos Apache Tribe explained that the proposed routes through the San Pedro Valley "cross through the heartland of the Western Apache homeland" and "have the potential of impacting culturally sensitive and sacred areas of significance and importance to the Tribe and the Tribe's members." The Tribe explained that it "emphatically opposes these routes," primarily because of "the discontinuation of meaningful consultation with the Tribe's representatives and department managers" regarding the impacts to cultural resources and landscapes. Despite promises of further consultation pursuant to Section 106, such additional process failed to materialize. The Tribe also expressed concerns regarding the qualifications of cultural consultants and archaeologists employed by SunZia Transmission, LLC given the well-documented "subtlety of Apache sites and the difficulty in proper identification of remains," and requested that such

personnel be "thoroughly vetted for their knowledge of Apache culture, tradition and religion and the identification of Apache cultural sites and sacred areas."

67.     In its comments, the San Carlos Apache Tribe noted that its concerns regarding BLM and SunZia Transmission, LLC's "sensitivity regarding Apache cultural sites, sacred areas, plant gathering areas and identification of remains is only exacerbated by the complete lack of sensitivity in the description of cultural resources" along the preferred right-of-way route alternative. For example, the Tribe informed BLM that the Draft EIS's discussion of the preferred alternative "fails to address the location of Camp Grant, the Camp Grant Apache Reservation and the Camp Grant Massacre site and their significance to the San Carlos Apache Tribe." The Camp Grant Massacre occurred in 1871, when a group of Anglo-Americans, Mexicans, and Tohono O'odham came upon and slaughtered between 110 and 144 unarmed Apache, most of whom were women and children. Those who participated in the massacre were later acquitted. Apache remains have been found throughout the area of the massacre. The Tribe explained that "[t]he failure to mention these events or sites is an insult to Apache people" and "renders the entire proposed cultural consultation process . . . suspect." The Tribe concluded that "[t]he significance of the area" that will be impacted by the preferred alternative "to the San Carlos Apache Tribe and people cannot be overstated." The Tribe offered to assist BLM "in any reasonable manner possible," including by providing BLM with information concerning "the historical import of this area and its cultural significance to the San Carlos Apache people."

68.     Federal agencies with expertise in federal trust and cultural resources also voiced their concerns with BLM's inadequate consideration of impacts to those resources. For example, the National Park Service ("NPS") argued that "[t]he section on tribal concerns is minimal" and that "[f]urther efforts need to be made" to engage the tribes and address their concerns. NPS also explained that

"[c]ultural resource sections throughout the [Draft] EIS focus primarily on archeological resources and largely ignore other types of cultural resources such as historic buildings, structures, objects, landscapes, and traditional cultural properties." According to NPS, "[t]his is not adequate to address (identify and evaluate) other types of cultural resources within the study area." Moreover, "[t]he government-to-government tribal consultation process appears inadequate." In particular, "[r]esource impacts from the perspective of the tribes and cultural communities are not addressed." NPS ultimately recommended that BLM "more definitively describe and evaluate potential impacts to cultural landscapes and resources surrounding NPS lands to effectively avoid, minimize, and potentially mitigate impacts connected" to the Project. The agency offered to host and facilitate face-to-face meetings with Tribes that would be affected by the Project's activities on NPS land.

### D.   The 2013 Final EIS

69.     BLM issued its Final EIS in June 2013. The Final EIS explained that "[t]ribal concerns regarding this Project are being compiled and will continue to be documented as the Project becomes more defined." The Final EIS also explained that "[c]onsultation with appropriate land management agencies, tribal governments, [THPOs], and SHPOs is ongoing and will result in a [Programmatic Agreement] that will establish project-specific procedures for complying with the NHPA, including those to follow during the execution of the Project." With respect to the agency's progress in developing an inventory of historic and cultural sites that may be affected by the Project, BLM acknowledged that the Class II judgmental sample inventory had been completed. The agency stated that "[a]n intensive Class III pedestrian inventory of any route that may be ultimately approved identifying all the cultural resources will be completed," after which the identified resources will "be evaluated for their eligibility to the National

1   Register." Accordingly, Section 106 consultation "will continue during the post-

2   EIS phases of Project implementation prior to construction."

3        70.    In response to the myriad concerns repeatedly raised by Plaintiffs

4   and others regarding BLM's failure to engage in meaningful consultation under

5   Section 106, BLM merely kicked the proverbial can down the road. The agency

6   variously insisted that "[c]onstruction of the Project along this [preferred] route

7   would avoid the majority of known cultural resource sites located along the San

8   Pedro River, and avoid impacts to cultural resources within the Tucson area"; that

9   the Section 106 process—including the identification of an APE and any analysis

10   of adverse effects—was ongoing and would continue to compile and document

11   tribal concerns; and that "[t]he list of preparers and contributors includes BLM and

12   consultant cultural resources specialists," several of whom "have . . . degrees in

13   Anthropology and Landscape Architecture."

14        71.    In 2013, Plaintiff Center for Biological Diversity and others

15   submitted an official protest to BLM raising grave concerns about the Project, as

16   allowed under BLM's regulations. Relevant here, the Center noted the discrepancy

17   between BLM's identification of a mere 188 sites that may be affected by BLM's

18   preferred alternative and Archaeology Southwest's conclusion that it had

19   identified over 500 archeological sites in the San Pedro River Valley,

20   approximately one-third of which contain architecture and probable human

21   remains. According to the protest, "[t]his discrepancy highlights a high degree of

22   uncertainty regarding potential impacts of the SunZia Project to cultural

23   resources" and underscores the need to "evaluate the use of existing transmission

24   and transportation corridors with less harmful effects." The protest also reiterated

25   the concerns voiced by the San Carlos Apache Tribe regarding the integrity of the

26   Section 106 process and informed BLM that the organizations "share the Tribe's

27   strenuous opposition to [the preferred alternative route]," and it requested that

1   "BLM implement the No Action Alternative to address these tribal concerns."

2   BLM denied all protests submitted on the Project.

3   **E.   The Section 106 Programmatic Agreement**

4   72.   In December 2014, BLM executed a Programmatic Agreement

5   pursuant to the NHPA and its implementing regulations. BLM, the New Mexico

6   and Arizona SHPOs, and the ACHP (which agreed to participate to resolve

7   adverse effects) were signatories to the Agreement. SunZia Transmissions, LLC

8   was an invited signatory. Several tribes, including Plaintiff Tribes, participated in

9   consultations for the development of the Agreement. The Tohono O'odham

10  Nation was invited to be an Invited Signatory to the Agreement; however, the

11  Tribe declined to sign. Other Tribes were invited to be Concurring Parties to the

12  Agreement; however, no Tribe signed. Archaeology Southwest was also invited to

13  be a Concurring Party, but declined to sign. Accordingly, neither the Tribes, nor

14  Archaeology Southwest are bound by the terms of the Programmatic Agreement.

15  *See* 36 C.F.R. § 800.6.

16  73.   The Programmatic Agreement defined the scale of the APE for

17  direct and indirect effects, i.e., generally a 420- to 1020-foot wide right-of-way

18  corridor and areas visible and within five miles of any Project component,

19  respectively. The Agreement directed SunZia Transmission, LLC to complete a

20  cultural resource inventory "to identify historic properties that could be affected

21  by" the Project. The initial inventory is to consist of: a Class I existing data (or

22  "records review") inventory "of all previously recorded cultural resources within

23  0.25 mile of the direct and indirect effects APEs"; and a "Class III Intensive Field

24  Inventory of the direct effects APE" and including cultural resources within the

25  indirect effects APE where the Project is visible to such resources.

26  74.   Based upon the initial inventory, SunZia Transmission, LLC must

27  prepare a comprehensive Inventory Report "incorporating findings from" the