**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tohono O'odham Nation, et al., | No. CV-24-00034-TUC-JGZ |
| Plaintiffs, | **ORDER** |
| v. | |
| United States Department of Interior, et al., | |
| Defendants. | |

Plaintiffs, the Tohono O'odham Nation, the San Carlos Apache Tribe, Archaeology Southwest (ASW), and the Center for Biological Diversity (CBD) filed this action against Defendants, United States Department of Interior, Deb Haaland, and United States Bureau of Land Management (BLM), under the Administrative Procedures Act (APA), alleging BLM violated the National Historic Preservation Act (NHPA) when it authorized construction to begin on the SunZia Transmission Line without assessing the Project's impacts on Traditional Cultural Properties (TCPs) or consulting with Plaintiff Tribes. (Doc. 16.) Plaintiffs seek a temporary restraining order and preliminary injunction to halt the Project's construction through the San Pedro Valley TCP. (*Id.* at 7.) On February 8, 2024, the Court granted SunZia's motion to intervene.[1] (Doc. 10.) Plaintiffs' motion is fully briefed. (Docs. 16, 27-29, 30-33, 35, 43.) On March 13, 2024, the Court held oral argument. (Doc. 48.) For the reasons that follow, the Court will deny Plaintiffs' request for injunctive relief.

---

[1] The Court will refer to Defendants and Intervenor-Defendants collectively as "Defendants."

## I.   BACKGROUND

### A. The Project

The SunZia Transmission Line (the Project) and associated wind projects are the largest clean renewable energy infrastructure project in U.S. history. (Doc. 27 at 11.) The Project consists of a 550-mile high-voltage transmission line that will deliver renewable energy from wind energy generating projects in New Mexico to three million customers in Arizona and California. (*Id.*) The Project route cuts through the San Pedro Valley in Arizona.

The San Pedro Valley is one of the most culturally intact landscapes in Southern Arizona. (*See* Doc. 16-8.) People have been living and traveling along the San Pedro River for the last 12,000 years and evidence of this past human activity remains to this day. (*Id.*) Because of its human history, the San Pedro Valley is an area of great cultural significance to several Native American Tribes including the Tohono O'odham Nation, the San Carlos Apache Tribe, the Hopi Tribe, and the Pueblo of Zuni. (*See* Doc. 16-9 at 4; Doc. 16-10 at 4-5; Doc. 16-11 at 6; Doc. 16-12 at 16; Doc. 16-13 at 19-22.)

### B. Legal Requirements

When a proposed federal agency action will have environmental impacts, including impacts on historic and cultural resources, the acting agency must comply with the regulations set forth in the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA). 42 U.S.C. § 4336; 54 U.S.C. § 306108.

The NEPA requires a federal agency to prepare an Environmental Impact Statement (EIS) when a proposed federal action may significantly impact the human environment. 42 U.S.C. § 4336. The key steps in the EIS process are: (1) Notice of Intent (NOI), which notifies agencies and individuals about the proposed action; (2) scoping, which is the period in which the federal agency and the public collaborate to define the range of issues and potential alternatives to be addressed in the EIS; (3) Draft Environmental Impact Statement (DEIS), which is published for review and comment for 45 days, and provides a description of the proposal, its impacts, and analysis of various alternatives; (4) the Final Environmental Impact Statement (FEIS), in which the acting agency responds to issues

raised on the DEIS; and (5) the Record of Decision (ROD), which explains the agency's decision, describes the alternatives the agency considered, and discusses plans for mitigation and monitoring. 42 U.S.C. §§ 4321-4347.

Section 106 of NHPA requires federal agencies to consider the potential effects of federal agency "undertakings" on historic properties. 54 U.S.C. § 306108. An "undertaking" is defined broadly to include any "project, activity, or program" that requires a federal permit. *Id.* at § 300320. "Historic property" includes any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register of Historic Places (NRHP). *Id.* at § 300308. A Traditional Cultural Property (TCP) is a property that is eligible for inclusion in the NRHP based on its associations with the cultural practices, traditions, beliefs, lifeways, arts, crafts, or social institutions of a living community. (Doc. 16-3 at 4.) TCPs may include "cultural landscapes." (*Id.* at 12.)

Where an agency determines that an "undertaking" has the potential to cause effects on "historic properties," the regulations provide for a four-step process:

(1) Initiate the Section 106 process;

(2) Identify, through reasonable and good faith efforts, historic properties within the area of potential effects (APE), and evaluate eligibility for listing historic properties on the National Register;

(3) Assess whether effects of the undertaking on any eligible historic property is adverse; and

(4) Seek to resolve any adverse effects.

36 C.F.R. § 800.3-800.6. These steps are accomplished through consultation with interested parties. *Id.* at § 800.1(a). Specifically, an agency must consult with any Native American Tribe "that attaches religious and cultural significance to [the affected] property" and provide the Tribe "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, . . . and participate in the resolution of adverse effects." *Id.* at § 800.2(c)(2)(ii).

In certain circumstances, an agency may enter into a Programmatic Agreement (PA) as a procedural substitute for implementation of the Section 106 process. *Id.* at § 800.14(b). When the "alternatives under consideration consist of corridors or large land areas," the PA allows the agency to "defer *final* identification and evaluation of historic properties" until after an agency has approved an undertaking. *Id.* at § 800.4(b)(2) (emphasis added). However, the agency must "proceed with the identification and evaluation of historic properties" as specific aspects of the undertaking are "refined." *Id.* Compliance with the PA procedures satisfies the agency's Section 106 responsibilities. *Id.* at § 800.14(b)(2)(iii).[2]

### C. Project Compliance

In 2008, SunZia applied to BLM for a right-of-way (ROW) permit to construct and operate a transmission line from New Mexico to Arizona. (Doc. 16 at 13; Doc. 27 at 15.) In 2009, BLM published a NOI to prepare an EIS pursuant to the NEPA. 74 Fed. Reg. 25,764 (May 29, 2009).

In May 2009, BLM sent a letter to twenty-one Native American Tribes initiating Section 106 tribal consultation under NHPA. (*See, e.g.,* Doc. 33-1 at 29-31; Doc. 33 at 5; Doc. 35-1 at 11.) BLM held consultation meetings with fourteen interested Tribes between July 2009 and December 2012, including at least seven meetings with the Tohono O'odham Nation and the San Carlos Apache Tribe. (Doc. 28 at 4; Doc. 28-1 at 2; Doc. 28-2 at 2-6.) In 2009, BLM conducted a Class I survey to identify cultural resources along alternative routes through reviews of existing data and literature. (Doc. 28 at 3.) In 2010, BLM initiated Class II surveys consisting of targeted field surveys of a sample of route locations. (*Id.* at 3-4.)

In April 2012, BLM sent another letter to the twenty-one Tribes it had originally contacted, plus six additional Tribes, providing an update on the Project and the NEPA and NHPA processes. (Doc. 35-1 at 11; *see, e.g.*, Doc. 33-2 at 2.)

---

[2] Prior to adopting a PA, an agency is required to consult with affected Tribes, SHPOs, and others, provide for public participation, and notify the consulting parties of the execution of the agreement and its effective date. 36 C.F.R. §§ 800.14(b)(2) & 800.6. Plaintiffs do not challenge BLM's compliance with these procedures.

In May 2012, BLM published the DEIS for public comment. (Doc. 16 at 15; Doc. 35-1 at 10.) BLM received feedback from various commentors expressing concerns about BLM's consultation efforts with interested parties and its delay in initiating the Section 106 process.[3] (Doc. 16-19 at 41-43; Doc. 16-20 at 2-3; Doc. 16-21.) In November 2012, BLM organized a visit to cultural resource sites in the San Pedro Valley which Officers from the Tohono O'odham Nation attended. (Doc. 33-2 at 33-39.)

In June 2013, BLM published the FEIS. (Doc. 16-19; Doc. 30-2 at 2.) The FEIS responded to substantive comments on the DEIS and explained that, after analyzing various alternatives, BLM had selected the "preferred alternative route" (the Project route) through the San Pedro Valley because it had the fewest impacts to cultural resources. (*See* Doc. 16-19; *see* Doc. 30-2 at 2.) The FEIS stated that Section 106 consultation was ongoing and would result in a PA that would establish Project-specific procedures for BLM to comply with NHPA. (Doc. 16-19 at 25-26.)

In December 2014, BLM and consulting parties executed the PA, which outlined BLM's continued obligations under Section 106 of NHPA. (*See* Doc. 16-24.) Specifically, the PA provided that (1) the identification of historic properties, (2) the assessment of the Project's adverse effects on historic properties, and (3) the mitigation of those adverse effects, would take place after BLM issued the ROD and ROW permit to SunZia, but before Project construction began. (Doc. 16-33 at 54; *see* Doc. 31-2 at 54.) The PA was signed by BLM, SunZia, the Arizona and New Mexico State Historic Preservation Officers (SHPO), and the Advisory Council on Historic Properties (ACHP). (*See* Doc. 16-24.) ASW signed the PA as a concurring party. (*Id.* at 54.) The Tohono O'odham Nation and San Carlos Apache Tribe did not sign the PA. (*Id.* at 39, 45)

Thirty days later, in January 2015, BLM issued the ROD approving BLM's

---

[3] The National Park Service commented that the DEIS section on tribal concerns was minimal and further efforts were needed. (Doc. 16-19 at 41-43.) ASW criticized BLM's failure to timely initiate the Section 106 process. (Doc. 16-20 at 2-3.) The San Carlos Apache Tribe expressed strenuous opposition to a route through San Pedro Valley (Doc. 16-21 at 6). The Tohono O'odham Nation did not comment.

preferred route through the San Pedro Valley. (Doc. 16-25 at 2; Doc. 30-1 at 2.) BLM issued the ROW permit to SunZia in 2016. (Doc. 16 at 20; Doc. 35-1 at 14.)

Per the PA, the Section 106 process continued after BLM's issuance of the ROD and the ROW. (Doc. 16 at 20; Doc. 16-33 at 54.) In 2018, BLM conducted Class III surveys, which entailed pedestrian surveys of the Area of Potential Effect (APE) along the Project route. (Doc. 28 at 6-7.) The findings were synthesized in a draft Cultural Resource Inventory Report and distributed to the consulting parties for a 60-day comment period. (Doc. 28 at 8.) Plaintiffs did not comment on any unidentified historic properties or raise concerns about the adequacy of BLM's identification effort. (Doc. 33-2 at 97-111, 119-20; Doc. 28 at 8-9.) The Arizona SHPO and the ACHP concurred with the findings of the Class III Inventory Report and the report was finalized in June 2018. (Doc. 33-2 at 129-30; Doc. 28 at 9.)

In November 2018, an indirect visual effects assessment of the cultural resources identified in the Inventory Reports was distributed to consulting parties for a 60-day comment period. (Doc. 33-3 at 6; Doc. 28 at 10.) This report assessed visual effects on cultural resources within five miles of the Project route. (Doc. 33-3 at 6; Doc. 28 at 10.) Plaintiffs did not comment on the visual effects assessment. (Doc. 33-3 at 9-11; Doc. 28 at 10.)

In 2020, SunZia applied to BLM for an amendment to the existing ROW Grant to modify the Project route through New Mexico. (Doc. 29 at 4.) The application also identified access roads and temporary disturbance areas in Arizona for construction along the Project route. (*Id.*) The application did not seek any change to the route in or around the San Pedro Valley. (*Id.*)

In March 2023, the Tohono O'odham Nation and the San Carlos Apache Tribe sent letters to BLM identifying the middle San Pedro Valley as a TCP and requesting that BLM "thoroughly reconsider alternative routes." (Doc. 16-32.) BLM met with the consulting parties on April 13, 2023 to discuss the Project and BLM's implementation of the PA. (Doc. 28 at 12; Doc. 33 at 18.) During that meeting, BLM stated that it would not consider alternative Project routes because the final Project route had been determined by the 2015

ROD. (Doc. 33 at 18.)

On June 20, 2023, a draft of the Arizona Historic Properties Treatment Plan (HPTP),[4] BLM's plan for mitigating adverse effects to historic properties within the APE, was provided to consulting parties for a 45-day review period. (Doc. 28 at 13; Doc. 33-4 at 18.) In accordance with the PA, a consultation meeting was held on July 14, 2023, during the 45-day review. (Doc. 28 at 10; Doc. 33-4 at 24.) On August 8, 2023, BLM met with the Four Southern Tribes[5] to discuss the HPTP. (Doc. 33 at 20.) On August 29, 2023, BLM distributed a revised Arizona HPTP to the consulting parties for an additional 21-day review. (Doc. 28 at 13-14.) The HPTP became final September 29, 2023. (*Id.* at 14.)

In August 2023, Plaintiff Tribes and ASW invoked the dispute resolution procedure in the PA asserting that BLM disregarded their requests to identify and consider TCPs including the likelihood that the San Pedro Valley was itself a TCP. (Doc. 31-2 at 89-91.)

BLM issued the Limited Notice To Proceed (LNTP) to SunZia to begin construction in the San Pedro Valley on September 28, 2023. (Doc. 31-3 at 12.)

On October 31, 2023, Plaintiff Tribes and ASW urged the Secretary of the Interior to intervene and halt construction. (*Id.* at 26-29.) On November 8, 2023, BLM ordered an immediate temporary suspension of SunZia's activities in the San Pedro Valley. (Doc. 35-1 at 21.) On November 24, 2023, BLM sent a letter to Plaintiff Tribes and ASW stating that rerouting the Project out of the San Pedro Valley was not an option and that BLM was never given sufficient details to consider the San Pedro Valley, or any of the resources within it, a TCP. (Doc. 31-3 at 65-71.) On November 27, 2023, the BLM director notified Plaintiff Tribes and ASW that the suspension of the LNTP would be lifted and construction would proceed. (Doc. 31-4 at 4-5.)

//

---

[4] The HPTP relied on the Class III Cultural Resource Inventory Report.

[5] The Four Southern Tribes coalition consists of representatives from the Gila River Indian Community, the Salt River Pima-Maricopa Indian Community, the Ak-Chin Indian Community, and the Tohono O'odham Nation. (Doc. 33-2 at 14.)

## II.    DISCUSSION

On January 30, 2024, Plaintiffs filed the instant Motion for Temporary Restraining Order and Preliminary Injunction to halt construction of the SunZia Project in the San Pedro Valley. (Doc. 16.) Plaintiffs argue that they are likely to succeed on the merits of their claim that BLM violated Section 106 of NHPA. Plaintiffs assert that BLM ignored the repeated entreaties of the Tribes and other stakeholders to evaluate the Project's effects on the San Pedro Valley TCP and cultural landscape until the Project route had become a *fait accompli*. (*Id*. at 30.) Plaintiffs assert BLM failed to make "reasonable and good faith efforts" to identify historic properties and consult with the Tribes. (*Id.* at 33-42.) Finally, Plaintiffs argue that BLM cannot rely on the PA to satisfy its Section 106 obligations. (*Id.* at 30-33.)

### A. Legal Framework

#### 1.    The Administrative Procedure Act

Section 106 of NHPA does not give rise to a "private" right of action against the federal government. *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005). Judicial review of agency decisions under NHPA is governed by the Administrative Procedures Act (APA). *Id.* The APA allows judicial review of a "final agency action," 5 U.S.C. § 704, and such review is highly deferential. *Center for Biological Diversity v. Kempthorne,* 588 F.3d 701, 707 (9th Cir. 2009). A court may only overturn agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Importantly, an APA claim must be brought within six years of the final agency action that is challenged. 28 U.S.C. § 2401(a); *Gros Ventre Tribe v. United States*, 469 F.3d 801, 814 n. 12 (9th Cir. 2006).

#### 2.    Preliminary Injunction Standard

A preliminary injunction is "a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Courts only grant preliminary relief when a plaintiff makes "a clear showing" of entitlement. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). When analyzing a motion for preliminary injunction, a court must determine whether the movant has

established that: (1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in his favor, and (4) a preliminary injunction is in the public interest. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). Likelihood of success on the merits is a threshold inquiry and is the most important factor in determining whether preliminary injunctive relief is warranted. *Id.* If the movant fails to show a likelihood of success on the merits, the court need not consider the other factors. *Id.* To establish likelihood of success, the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation. *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009). Here, Plaintiffs must show, at a minimum, that there are serious questions regarding BLM's compliance with Section 106.

**B. Likelihood of Success**

    **1. Plaintiffs' challenges to BLM's selection of the final Project route are time-barred.**

Plaintiffs fail to demonstrate likelihood of success on their claims. Plaintiffs' claims seek to reroute the Project out of the San Pedro Valley. Plaintiffs are unlikely to succeed because these claims are time-barred. The 2015 ROD constituted final agency action with respect to the determination of the final Project route. The 2015 ROD stated, "a right of way will be granted to SunZia transmission, LLC to allow for the construction and operation of two 500KV transmission lines . . . *following the route of BLM selected alternative*." (Doc. 30-1 at 9 (emphasis added).) The ROD outlined the alternative transmission line routes that BLM considered and the rationale behind its decision to adopt the Project route. (*Id.* at 10-11.) The ROD also described the consultation that informed BLM's decision, including the consultation that occurred under the NEPA and Section 106 of NHPA. (*Id.* at 12-14.) The ROD, on its face, informed that it was a final agency decision, stating, "[the Assistant Secretary of Land and Mineral Management's] approval of these decisions *constitutes a final decision* of the DOI and … any challenges to these decisions … must be brought in Federal District Court." (*Id.* at 3 (emphasis added).) Under the APA, Plaintiffs had six years to challenge BLM's 2015 selection of the final project route.

1  Plaintiffs' 2024 challenge to the ROD is therefore untimely.

2        The six-year limitation period similarly precludes Plaintiffs' challenges to the

3  adequacy of the Section 106 process underlying the selection of the Project route.[6] This is

4  because the remedy sought—relocation of the route—would require setting aside the 2015

5  ROD final agency decision. In 2024, this Court cannot revisit BLM's 2015 decision or the

6  sufficiency of BLM's actions underlying that decision because challenges to an agency's

7  final action must be brought within six years. 28 U.S.C. § 2401(a). Thus, any claim that

8  seeks as a remedy, the rerouting of the Project out of the San Pedro Valley, or the reopening

9  of the 2015 ROD, is time-barred.[7]

10       **2.  The PA did not contemplate selection of alternative Project routes.**

11       Plaintiffs argue that BLM's failure to consider alternatives, as required by NHPA,

12 "logically and legally . . . reaches back" to the 2015 ROD. (Doc. 43 at 18.) Plaintiffs assert

13 that they did not appeal the 2015 ROD because the "BLM signaled to consulting parties

14 that the PA process would be the agency's chosen—and *only*—vehicle for assessing

15 methods to avoid adverse effects to historic properties, including 'major reroutes' that were

16

17 [6] Plaintiffs assert that BLM's issuance of the 2015 ROD was based on inadequate
consultation in violation of the NHPA's directive to "consult" with involved parties "to
18 develop alternatives to the undertaking that could avoid, minimize, or mitigate" adverse
effects to historic properties. (Doc. 16 at 40); 36 C.F.R. § 800.6(a). Plaintiffs argue that
19 BLM should have first consulted with Plaintiff Tribes about alternative routes that might
mitigate adverse impacts. (Doc. 16 at 40.) Defendants dispute Plaintiffs' factual assertions.
20 Defendants argue that BLM coordinated the Section 106 process with the NEPA process
and engaged in robust consultation with Plaintiffs that informed the selection of the Project
21 route. (Doc. 27 at 15-18; Doc. 35-1 at 28.) The Court does not reach the merits of this
22 dispute.

23 [7] *Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104
24 (S.D. Cal. 2010), on which Plaintiffs rely, is inapposite. There, the district court found
BLM violated the NHPA in failing to engage in meaningful consultation with tribes prior
25 to selecting the final project route. However, in that case, the six-year APA statute of
26 limitations was not implicated because BLM issued the ROD on October 13, 2010, and
Plaintiffs filed their complaint challenging the adequacy of BLM's consultation 16 days
27 later.

28

not examined during the NEPA process." (Doc. 16 at 32-33). In other words, Plaintiffs believed that as BLM identified historic properties through the ongoing Section 106 process, it would consider alternative Project routes to avoid those properties. Plaintiffs misread the PA. The PA does not contemplate rerouting of the Project.

When an undertaking is complex, and the full effects to historic properties cannot be readily determined prior to an agency decision, NHPA regulations allow development of a PA to phase the NHPA Section 106 process. 36 C.F.R. § 800.14(b)(2). The PA is a tool for executing the NHPA process: (1) identification of historic properties within the Area of Potential Effects (APE) of the Undertaking that are eligible for listing on the National Register (NHRP); (2) assessment of adverse effects to those historic properties; and (3) resolution of the adverse effects. *Id.* at §§ 800.4–800.6. When a PA is adopted, compliance with the PA's procedures satisfies the agency's Section 106 responsibilities. *Id.* at § 800.14(b)(2)(iii).

Here, the 2015 ROD expressly adopted the "phased approach" to the Section 106 process and provided that the identification and evaluation of cultural resources would "be completed *after the ROD and right-of-way permit are issued*, but prior to Project construction." (Doc. 16-33 at 54 (emphasis added).) The ROD and the PA were intended to work in conjunction with one another—the ROD determining the final Project route and the PA outlining BLM's Section 106 obligations moving forward. The PA was incorporated within the 2015 ROD decision, (*see* Doc. 16-25 at 5), and the PA contained a "Project Description," which included a map and detailed description of the preferred Project route. (Doc. 16-24 at 22.)

The PA does not provide for further selection of a Project route. The PA does state that "[a]voidance measures for cultural resources may include (but are not limited to) *realignment* of the transmission line." (Doc. 16-24 at 9 (emphasis added).) Although neither the PA nor NHPA define the term "realignment," in common usage, "realignment" means "changing the position or direction of something slightly." *Realignment*, Oxford Learners Dictionary (2024). Thus, although the PA's terms require BLM to prioritize the avoidance of "all types of historic properties," including through "realignment" of the

Project, the use of the term "realignment" supports Defendants' assertion that the PA allowed for slight modifications to the Project route; it did not provide for the selection of an entirely new route.[8]

### 3. BLM's issuance of the LNTPs did not reopen the 2015 ROD.

Plaintiffs assert that the 2015 ROD was the culmination of the NEPA process, but the 2023 LNTPs set forth BLM's final agency action with respect to the NHPA process. (Doc. 43 at 13-17.) According to Plaintiffs, the LNTPs are challengeable final agency actions because the LNTPs signify the end of BLM's decisionmaking process under NHPA and its conclusion that construction activities would not adversely affect historic properties. (*Id*. at 14-15.) Because the LNTPs were issued in 2023, Plaintiffs reason that their challenge to BLM's selection of the Project route is timely. The Court concludes that the LNTPs did not constitute final agency action with respect to the selection of the Project route.

A Notice to Proceed authorizes construction on a project. (*See, e.g.,* Doc. 31-3 at

---

[8] The record shows that Plaintiffs were aware that BLM's selection of a route would preclude consideration of alternative routes. In an August 2012 letter to BLM, ASW stated that "complying with Section 106 now will ensure that BLM does not select a project alternative before Section 106 consultation, *which would impermissibly foreclose alternatives, such as selecting a different route or route segments*, to 'avoid, minimize, or mitigate' the adverse effects of the project." (Doc. 16-20 at 3 (emphasis added).) Similarly, in a December 2012 letter to BLM, ACHP Director Reid Nelson wrote:

> We note that BLM chose the preferred alternative for the undertaking before initiating Section 106 consultation . . . Consulting parties under Section 106 are now requesting *refinements in the preferred alternative* to ensure that identified historic properties along that route are taken into account. We urge BLM to work with these parties to ensure that their concerns are addressed and that, wherever possible, *the preferred route be adjusted* to avoid adverse effects.

(Doc. 33-1 at 16 (emphasis added).) Also, in 2012, a BLM representative noted that he had a detailed discussion with an officer of the San Carlos Apache Tribe "about all the reasons BLM chose the preferred alternative and [the tribal officer] agree[d] that it [did] appear to be the best choice under the circumstances." (*See* Doc. 33-2 at 30.)

12; *see, e.g.,* Doc. 31-4 at 4.) It signals that all pre-construction conditions have been met and that work can begin according to the terms laid out in the previous contract. (*Id.*) An LNTP specifies which portions of a job the contractor should begin work on. (*Id.*)

Here, the LNTPs authorized construction to begin on the route, as previously outlined in the 2015 ROD. (*Id.*) As such, it was the 2015 ROD, not the LNTPs, that approved the route through the San Pedro Valley. The issuance of the LNTPs simply indicated that all pre-construction conditions were met. The ongoing nature of the Section 106 process did not prevent the 2015 ROD from constituting final agency action. Neither BLM's ongoing obligations under the PA, nor the issuance of the LNTPS, provide a back door to reopening the 2015 ROD. In *Battle Mountain Band v. United States Bureau of Land Mgmt.*, No. 3:16-CV-0268-LRH-WGC, 2016 WL 4497756, at *6 (D. Nev. Aug. 26, 2016), the district court held that the identification of eligible TCPs in the Area of Potential Effect after the ROD had been issued did not require BLM to reexamine its ROD and other relevant decisions before allowing construction to proceed. Like the court in *Battle Mountain Band*, the Court concludes that Plaintiffs cannot use the PA process or the LNTPs to challenge the selection of the final Project route.

**C. BLM's compliance with the PA**

Plaintiffs argue that BLM cannot rely on the PA to show that it has satisfied its Section 106 obligations because BLM failed to carry out its duties under the PA. (Doc. 16 at 30-33; Doc. 43 at 20-23.) According to Plaintiffs, BLM delayed meaningful consultation regarding TCPs until after the Project route had been set and refuses to consider measures to avoid impacts to TCPs, despite BLM's assurances that the PA process "should be broad enough and flexible enough to allow for all manner of avoidance and mitigation." (Doc. 43 at 20.) Plaintiffs conclude that BLM has not, therefore, complied with the Section 106 process.

Because federal regulations state that an agency's compliance with a PA fulfills its Section 106 responsibilities, a court must analyze the PA to determine whether agency action is compliant with the PA's terms. *See Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 847 (10th Cir. 2019) (stating that the issue to resolve is whether

agency violated requirements of a PA); *Colo. River Indian Tribes v. Dep't of Interior*, No. ED CV-1402504 JAK (SPx), 2015 WL 12661945, at *13 (C.D. Cal. June 11, 2015) (explaining that obligations under a PA serve as a substitute to compliance with Section 106). An executed PA "is legally binding on the agency" and "shall govern the undertaking and all its parts." ADVISORY COUNCIL ON HISTORIC PRESERVATION, Types of Agreement Documents in Section 106 (September 25, 2018), https://www.achp.gov/sites/default/files/2021-11/TypesofAgreementDocuments11-19-21.pdf. As such, "[PAs] must be written carefully and clearly so that everyone understands what they call for and the agency is able to fully carry out all legal obligations to which it has agreed." (*Id.*)

The 2014 PA sets forth the process for BLM to satisfy its Section 106 obligations and proceeds in several phases. Relevant here, the first phase of the PA required BLM to identify historic properties by completing a Cultural Resources Inventory Report and soliciting feedback from consulting parties. (Doc. 16-24 at 6-9.) In the second phase, the PA requires BLM to mitigate adverse impacts of the Project on historic properties by developing a Historic Property Treatment Plan. (*Id.* at 9.) The Court concludes that Plaintiffs do not raise serious questions with respect to BLM's implementation of the PA because BLM (1) complied with its obligation to identify historic properties, (2) considered measures to avoid adverse impacts to historic properties, and (3) consulted with Plaintiff Tribes during each phase of the PA.

### 1. BLM identified historic properties that could be affected by the Project.

Plaintiffs argue that BLM failed to lawfully identify historic properties because it concluded that the San Pedro Valley neither contained nor comprised a TCP. (Doc. 16 at 33.) Plaintiffs assert that despite repeatedly informing BLM for decades of the tribal significance of the San Pedro Valley as a TCP, BLM never followed up on that information and instead, willfully ignored it. (*Id.* at 37.)

With respect to the identification of historic properties, including TCPs, phase one of the PA required BLM to "complete a cultural resources inventory to identify historic properties that could be affected by the Undertaking." (*Id.* at 6.) Specifically, the PA

obligated BLM to: (1) conduct a Class I survey to compile existing data of all previously recorded cultural resources within .25 mile of the APE; (2) conduct a Class III Intensive Field Inventory of the direct effects of the APE including an assessment of visual impacts on historic properties within the direct and indirect APE; and (3) prepare a comprehensive Inventory Report incorporating the findings from those surveys providing for a 60-day comment period for consulting parties. (*Id.* at 6-7.)

BLM complied with the requirements of phase one by completing the Class I and Class III inventories and soliciting comments from the Tribes on the adequacy of the identification process. Previously, during the EIS phase, BLM conducted Class I and Class II surveys in an effort to identify historic properties. (Doc. 28 at 3-4.) The Class I survey involved collecting and reviewing previous surveys of recorded archaeological sites and historic resources within the area for the proposed Project route and alternatives. (*Id.*) To supplement the Class I survey, the Class II survey assessed where cultural resources would likely occur along the various alternative routes. (*Id.*) The Class I and Class II survey results were included in the DEIS for comment (Doc. 28 at 3-4), as well as in the FEIS (Doc. 29-2 at 10, 24).

BLM conducted the Class III intensive field inventory in 2018, which entailed one-hundred-percent pedestrian ground coverage of the APE. (Doc. 28 at 6-7.) The Class III survey resulted in the identification of 73 cultural sites, of which BLM recommended that 59 be determined eligible for the NRHP and 14 be determined not eligible. (Doc. 33-2 at 113.) Based on the Class III survey, a Draft Cultural Resources Inventory Report was prepared and distributed to consulting parties in 2018, including Plaintiff Tribes and ASW, for a 60-day comment period. (Doc. 28 at 8.)

Once the Draft Cultural Resources Inventory Report was distributed for review, the PA provided for consulting parties to comment on (1) the adequacy of the identification effort, (2) the NRHP eligibility of the cultural resources identified, (3) the assessment of effect of the undertaking, and (4) whether there were *any properties of traditional cultural or religious importance* to tribes and ethnic groups that were *not identified in the inventory*." (Doc. 16-24 at 7 (emphasis added).) Plaintiffs did not assert any unidentified

TCPs during the comment period on the Draft Cultural Resources Inventory Report.[9] (Doc. 35-1 at 16; Doc. 33-2 at 97-111, 119-20.) The SHPO and ACHP concurred with the findings of the Arizona Class III Inventory Report, and the reports were finalized in June 2018. (Doc. 33-2 at 129-30.)

Plaintiffs state they did not identify TCPs in response to the Draft Cultural Resources Inventory Report because they believed that BLM would conduct a separate landscape study, which would be the more appropriate forum for raising unidentified TCPs.[10] (Doc. 43 at 20.) The PA, however, did not obligate BLM to conduct a cultural landscape study, (*see* Doc. 16-24), and any representations[11] that such a study would be

_____

[9] Plaintiffs argue that the facts of this case are analogous to *Pueblo of Sandia v. United States*, 50 F.3d 856 (10th Cir. 1995). There, the court found that the Forest Service failed to follow up on information from plaintiffs, even though it knew plaintiff tribes might be "hesitant to divulge the type of information" it was seeking. *Id.* at 860-61. The court also found the Forest Service did not act in good faith, because it had withheld information from the SHPO that, once disclosed, caused the SHPO to withdraw its concurrence with the agency's findings. *Id.* at 858, 862-63. Here, BLM provided opportunities for Plaintiffs to comment on the adequacy of BLM's identification efforts and there is no evidence suggesting that BLM's execution of the PA was compromised by lack of integrity or omission, such as by manipulating or ignoring evidence. In fact, the SHPO concurred with BLM's findings. (Doc. 33-2 at 129-30.)

[10] Plaintiffs first raise this argument in their reply, (Doc. 43 at 20), depriving Defendants of an opportunity to respond. The Court rejects the argument for this additional reason. *See* 16 C. Wright, A. Miller, E. Cooper, & E. Grossman, Federal Practice and Procedure § 3974 at 428 (1977) ("[C]ourt decisions have made it clear that the appellant cannot raise new issues in a reply brief; he can only respond to arguments raised for the first time in appellee's brief."); *Knighten v. Commissioner*, 702 F.2d 59, 60 n. 1 (5th Cir.), *cert. denied*, 464 U.S. 897 (1983) ("It is impermissible to mention an issue for the first time in a reply brief because the appellee then has no opportunity to respond.").

[11] Plaintiffs point to two representations that a landscape study would be conducted. First, during the 2018 draft Cultural Resources Inventory Report comment period, a Tohono O'odham Tribal Officer inquired about a cultural landscape study. A BLM representative responded, "we agreed to do [a landscape study] separate from the class III." (Doc. 33-2 at 111.) Second, in a January 2024 self-certification letter to the Arizona Corporation Commission, SunZia acknowledged that a condition of the Commission's February 2016 issuance of a Certificate of Environmental Compatibility required: "A Class III cultural

completed, were not of such a nature that they amended the PA. Consequently, BLM's decision to proceed without a cultural landscape study was not a violation of the PA or Section 106. BLM fulfilled its obligations under the PA to identify historic properties through a Class III survey and to prepare a Cultural Resources Inventory Report. Plaintiffs had an opportunity, under the terms of the PA, to raise unidentified properties of traditional cultural or religious importance during the review and comment period on the report. Plaintiffs did not voice concerns about the adequacy of BLM's efforts to identify TCPs until March 2023. (Doc. 16-32 at 3.)

### 2. BLM avoided adverse impacts to historic properties.

With respect to mitigating adverse impacts to historic properties, the PA required BLM to, "if possible, avoid adverse effects to all types of historic properties." (Doc. 16-24 at 9.) Avoidance measures included, but were not limited to, "realignment of the transmission line, fencing of sites during construction, monitoring or construction near site, or placing towers, maintenance roads and ancillary facilities outside of site boundaries." (*Id.*) Where avoidance measures were not possible, BLM was required to "minimize or mitigate adverse effects to historic properties." (*Id.*) With respect to the resolution of adverse effects, the PA required that BLM develop a Historic Property Treatment Plan to "identify the nature of the effects to historic properties and describe the strategies proposed to avoid, minimize, or mitigate those effects." (*Id.*)

Plaintiffs assert that BLM's failure to comply with the PA is "demonstrated by its refusal to meaningfully consider measure to avoid impacts to TCPs." (Doc. 16 at 31.) Plaintiffs argue that the "avoidance" mandated by the PA required BLM to consider the San Pedro Valley as a TCP that must be avoided entirely by the Project route. (*Id.* at 32.) The Court has already rejected this claim and concludes that it is time-barred. (*See* Section

resource survey and cultural landscape study shall be conducted to fully evaluate the impacts of the Project on the cultural landscape." (Doc. 43-11 at 27-28.) In the letter, SunZia reported that BLM indicated that it received inadequate information to justify the development of a separate, new landscape scale cultural resources study. (*Id.*)

B.1.) To the extent that Plaintiffs argue that the San Pedro Valley *contains* TCPs that BLM has refused to avoid, Plaintiffs have yet to identify any TCPs, or other historic properties that BLM overlooked in NHPA process.[12] On the contrary, the record supports BLM's assertion that the Project route avoids direct impacts to all cultural resource sites identified by consulting parties in the San Pedro basin.[13]

Finally, BLM complied with its obligation to prepare an HPTP to identify historic properties and outline efforts to mitigate adverse impacts of the Project. The process for developing the Arizona HPTP began in 2018 with the Class III pedestrian cultural resources survey of the APE. (Doc. 28 at 10.) On June 20, 2023, BLM submitted the HPTP to consulting parties for an initial review. (Doc. 28 at 13; Doc. 33-4 at 18, 21-22.) In

---

[12] During oral argument, the Court asked Plaintiffs whether their assertion was that the San Pedro Valley constituted a TCP, whether it contained TCPs, or both. Plaintiffs responded that it was too premature to say. (Doc. 53 at 35-36) ("Whether there is a TCP, whether it's the entire valley or parts thereof, it's premature I think to speculate on."). While BLM is required to conduct follow up investigation to identify historic properties, 36 C.F.R. § 800.4, BLM is not required to conduct a "fishing expedition" for unidentified TCPs. *Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223, 1232 (9th Cir. 1999) ("There has to be some good evidence of just where the site is and what its boundaries are, for it to qualify for federal designation as a historical site."). Once Plaintiffs invoked the PA dispute resolution mechanism, BLM requested (1) the location and tangible features of the claimed TCP be identified and (2) an explanation of how those features fit within the relevant National Register criteria. (Doc. 28 at 12; Doc. 28-6 at 3.) Apart from recently asserting a valley-wide TCP, Plaintiffs have not identified tangible locations that could be considered for eligibility as a TCP. (Doc. 27 at 34; *cf*. Doc. 27 at 35, n. 7.)

[13] During the EIS phase, ASW identified ten priority conservation areas in the San Pedro Valley, and BLM ensured that they were avoided by the Project route. (Doc. 28 at 4-5.) Based on input from Tohono O'odham tribal members during the 2012 field visit to San Pedro Valley, the Project route was redesigned to avoid direct impacts to a cluster of cultural sites near the San Pedro River. (Doc. 16-34 at 95-96.) During the Class III survey, which included the participation of tribal cultural resource specialists, fourteen archaeological sites were found within the San Pedro Basin and direct impacts to those sites were avoided. (Doc. 28 at 8.) Ultimately, "[i]n Arizona, 63 historic properties were found within the Area of Potential Effects (APE), 43 were avoided or effects were determined to not be adverse and 20 were subjected to adverse effects and mitigated (or will be mitigated) prior to construction." (Doc. 33 at 22.)

accordance with the PA, a consultation meeting took place during the 45-day review on July 14, 2023. (Doc. 33-4 at 24; Doc. 33 at 20.) During this meeting, BLM and other consulting parties discussed the proposed treatments for direct effects to most Arizona sites and BLM related that it intended to develop a second HPTP to resolve the adverse visual and indirect effects to certain properties.[14] (Doc. 33 at 20.) BLM received comments on the draft HPTP from the Arizona SHPO and other consulting parties. (Doc. 33 at 20; Doc. 33-4 at 34-36, 37-50.) BLM addressed the comments and transmitted a revised Arizona HPTP to the consulting parties for a final 21-day review on August 28, 2023. (Doc. 33 at 21; Doc. 33-4 at 56-57.) The Arizona HPTP was finalized in consultation with the State Historic Preservation Officer, in accordance with the PA, on September 29, 2023. (Doc. 33 at 21; Doc. 33-4 at 59.)

### 3. BLM is complying with its obligation to "continue to consult" with Tribes throughout the Section 106 process.

Section 106 consultation must afford Tribes "a reasonable opportunity to identify concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate [their] views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800.2.5. However, "consultation" does not require agreement among parties, nor does NHPA require that the consulting parties support the final outcome. 36 C.F.R. § 800.16(f). Rather, consultation is "the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the Section 106 process." *Id.*

The PA required that BLM consult with the Tribes at each phase in the process. (*See* Doc. 16-24.) For example, during the identification phase, BLM was required to "continue to consult with Indian tribes regarding properties of traditional religious and cultural

---

[14] Plaintiffs state that the second HPTP has not been distributed to consulting parties, even as construction proceeds in the San Pedro Valley causing irreparable harm. (Doc. 16 at 24.) However, BLM apparently has not yet issued any LNTPs for segments of the transmission line that have not been addressed in the HPTP. (Doc. 35-1 at 33; Doc. 32 at 11.)

importance to them that might be affected by the Undertaking," and "provide opportunities for review and comment on draft and final versions of the Inventory Report." (Doc. 16-24 at 8.) During the mitigation phase, BLM was required to, "develop avoidance measure for any properties of religious or cultural importance in consultation with the SHPO and affected tribes." (*Id.* at 9.) The PA also required BLM to provide consulting parties with the draft HPTP for their review, "requesting comments on the adequacy of the proposed treatment measures," and "meeting . . . with all interested consulting parties during the review period." (*Id.* at 12.)

BLM solicited feedback from Plaintiff Tribes during each phase of the PA process, inviting Plaintiff Tribes to comment and consult on the Cultural Resource Inventory Report, the visual assessment survey, and the HPTP. (Doc. 28 at 8, 10, 13; Doc. 33 at 14, 20.) BLM made efforts to consult with Plaintiffs in March 2023 after the San Carlos Apache Tribe and the Tohono O'odham Tribe sent letters to BLM explicitly identifying the San Pedro Valley as a TCP and requesting that the agency "thoroughly reconsider alternative routes." (Doc. 16-32 at 3.) On March 17, 2023, BLM attended the Four Southern Tribes Cultural Resources Working Group meeting to address questions and concerns raised by Plaintiffs. (Doc. 28 at 12.) BLM met with the consulting parties again on April 13, 2023, to give an update on the Project and explain how they were implementing the PA. (Doc. 33-3 at 78.) BLM explained that they would not be revisiting the 2015 routing decision through the San Pedro Valley. (*Id.*) BLM held another meeting with consulting parties on July 14, 2023, to answer questions and discuss proposed archaeological treatments. (Doc. 33-4 at 24.) On August 8, 2023, BLM met with the Four Southern Tribes at the request of the Tohono O'odham Nation to discuss the HPTP. (Doc. 28 at 13.) The record demonstrates clear efforts by BLM to meet with Tribes to address their concerns.

When Plaintiff Tribes and ASW invoked the dispute resolution process in August 2023 (Doc. 31-2 at 89-91), BLM suspended construction in the San Pedro Valley and attempted to consult with Plaintiffs. (Doc. 35-1 at 21). On November 14, 2023, a virtual meeting took place with the disputing parties, BLM and ACHP in attendance. (Doc. 31-3 at 62-63.) Parties came to an impasse when it became evident that Plaintiffs wanted BLM

to evaluate the San Pedro Valley as a TCP and consider rerouting the Project in order to avoid adverse impacts to a valley-wide TCP. (*Id.* at 65-70.) Nevertheless, consultation efforts with the Tribes remain ongoing and a working group comprised of various tribal members and other experts has been tasked with considering the appropriate mitigation efforts for the San Pedro Valley. (Doc. 35-1 at 22, 35.) In a November 24, 2023 letter to the Chairman of the Tohono O'odham Tribe, BLM stated:

> We will continue to make every effort to consult with you and other Tribes, obtain information from the Tribes about San Pedro Valley, and to develop, as appropriate, treatment plans to address any adverse effects. We hope to proceed expeditiously and *would be willing to assume the San Pedro Valley is a TCP* in order to immediately begin to discuss mitigation.

(Doc. 31-3 at 69 (emphasis added).)

Plaintiffs compare the lack of consultation by BLM in *Quechan*, 755 F. Supp. 2d at 1109, with BLM's alleged lack of consultation with the Tribes in this case. However, in *Quechan*, the impacted tribes actively sought to consult with BLM by responding to BLM's letters and requesting more in-depth consultation, but BLM either ignored or never granted those requests. *See id.* at 1118-20. Here, as detailed above, Plaintiff Tribes were afforded various consultation opportunities. Moreover, BLM continues to consult with parties to address their concerns. (Doc. 31-3 at 69.) For these reasons, the Court concludes that Plaintiffs have failed to show that BLM did not comply with the Section 106 process provided in the PA.

In sum, Plaintiffs have not satisfied the threshold inquiry by demonstrating that they are likely to succeed on the merits of their claims. Therefore, the Court does not address the other preliminary injunction factors. Accordingly,

//
//
//
//
//
//

1      **IT IS ORDERED** that Plaintiffs' Motion for Temporary Restraining Order and
2  Preliminary Injunction (Doc. 16) is **denied**.
3      Dated this 16th day of April, 2024.

Jennifer G. Zipps
United States District Judge