ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

AMBER DUTTON-BYNUM
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 330-2649
Amber.Dutton-Bynum@usdoj.gov

DEVON LEHMAN MCCUNE
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th St. N. Terrace, Suite 600
Denver, CO 80202
Tel: (303) 358-8981
Devon.McCune@usdoj.gov

*Attorneys for the United States*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**
**TUCSON DIVISION**

| | |
|---|---|
| Tohono O'odham Nation, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>United States Department of the Interior, *et al.*,<br><br>　　　　Defendants,<br><br>　　and<br><br>SunZia Transmission, LLC,<br><br>　　　　Intervenor-Defendant. | No. 4:24-cv-00034-JGZ<br><br><br>**FEDERAL DEFENDANTS'<br>COMBINED OPPOSITION TO<br>PLAINTIFFS' MOTION FOR<br>SUMMARY JUDGMENT AND<br>CROSS-MOTION FOR<br>SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................. 1

II.    REGULATORY AND STATUTORY FRAMEWORK ...................................... 2

    A.    National Historic Preservation Act .......................................................... 2

III.   FACTUAL BACKGROUND ............................................................................ 4

    A.    Project Overview ..................................................................................... 4

    B.    NEPA Process .......................................................................................... 5

    C.    Consultation with Plaintiff Tribes and the Section 106 Process............... 8

    D.    Project-specific Programmatic Agreement ............................................. 10

    E.    2015 ROD .............................................................................................. 12

    F.    2018 Class III Cultural Resources Survey .............................................. 12

    G.    ROW amendment and 2023 EIS ............................................................. 14

    H.    Efforts to Consult Plaintiff Tribes in 2023 ............................................ 15

    I.    Arizona Historic Properties Treatment Plan Preparation........................ 17

    J.    2023 Dispute Resolution........................................................................ 18

    K.    Relevant Limited Notices to Proceed .................................................... 18

    L.    Procedural History ................................................................................. 20

IV.    STANDARD OF REVIEW ............................................................................ 21

V.     ARGUMENT................................................................................................. 22

    A.    BLM complied with the National Historic Preservation Act................... 23

        1.    Plaintiffs fundamentally misunderstand the purpose of the 2015 ROD. .......................................................................................... 24

        2.    The record reveals BLM's considerable consultation efforts leading up to the PA and the 2015 ROD. ........................................... 25

        3.    BLM's consultation efforts continued throughout the PA process........... 26

        4.    Plaintiffs misrepresent the record to fit their faulty premise. ................... 30

        5.    BLM otherwise complied with the PA before issuing issued the

i

LNTPs. ...................................................................................................... 37

      6.     Neither the NHPA nor the Project-specific PA require "avoidance" of TCPs. ...................................................................................... 41

      7.     BLM reasonably authorized construction prior to finalizing the HPTP addendum. ........................................................................ 43

   B.    Portions, if not all, of Plaintiffs' case is likely moot and any remedy that could be available would be limited to further consultations. .............................. 44

VI.     CONCLUSION.................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Ariz. Mining Reform Coal. v. U.S. Forest Serv.*,
  172 F.4th 641 (9th Cir. 2026) .................................................................................. 2, 3

*Battle Mountain Band of Te-Moak Tribe of W. Shoshone Indians v. U.S. Bureau of Land Mgmt.*,
  302 F. Supp. 3d 1226 (D. Nev. 2018).................................................................... 30

*Concerned Citizens & Retired Miners Coalition v. Forest Serv.*,
  279 F. Supp. 3d 898 (D. Ariz. 2017) .................................................................... 40

*CTIA-Wireless Ass'n v. FCC*,
  466 F.3d 105 (D.C. Cir. 2006)................................................................... 3, 42, 45

*Ctr. for Biological Diversity v. Esper*,
  958 F.3d 895 (9th Cir. 2020) ................................................................................ 21

*Fed. Communications Commission v. Prometheus Radio Project*,
  592 U.S. 414 (2021)................................................................................... 22, 36

*Friends of the Clearwater v. Dombeck*,
  222 F.3d 552 (9th Cir. 2000) ................................................................................ 42

*Hoonah Indian Ass'n v. Morrison*,
  170 F.3d 1223 (9th Cir. 1999) .............................................................................. 32

*Mid States Coal. for Progress v. STB*,
  345 F.3d 520 (8th Cir. 2003) ................................................................................ 24

*Monsanto v. Geerton Seed Farms*,
  561 U.S. 139 (2010)............................................................................................... 45

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983)................................................................................................. 22

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
  177 F.3d 800 (9th Cir. 1999) ..................................................................... 2, 3, 36

*Nat'l Wildlife Fed'n v. Espy*,
  45 F.3d 1337 (9th Cir. 1995) ................................................................................ 45

*Pueblo of Sandia v. United States*,
  50 F.3d 856 (10th Cir. 1995) ..................................................................... 35, 36

*Quechan Tribe of Fort Yuma Indian Rsrv. v. Dep't of the Interior*,
  927 F. Supp. 2d 921 (S.D. Cal. 2013), *aff'd,* 673 F. App'x 709 (9th Cir. 2016)...................... 36

*Reno-Sparks Indian Colony v. Haaland*,
  663 F. Supp. 3d 1188 (D. Nev. 2023)................................................................. 36

*San Carlos Apache Tribe v. U.S. Forest Serv.*,
  803 F. Supp. 3d 879 (D. Ariz. 2025) ................................................. 4, 22, 24, 25, 27, 36, 40

*San Carlos Apache Tribe v. United States*,

iii

272 F. Supp. 2d 860 (D. Ariz. 2003) ..................................................................... 22

*San Carlos Apache Tribe v. United States*,
   417 F.3d 1091 (9th Cir. 2005) ................................................................ 2, 21, 23, 42

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ................................................................................ 22

*Seven Cnty. Infrastructure Coalition v. Eagle Cnty.*,
   605 U.S 168 (2025)............................................................................................... 45

*Snoqualmie Indian Tribe v. FERC*,
   545 F.3d 1207 (9th Cir. 2008) ........................................................................ 24, 25

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   205 F. Supp. 3d 4 (D.D.C. 2016)................................................................. 3, 23, 42

*Te-Moak of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
   608 F.3d 592 (9th Cir. 2010) .................................................................. 2, 3, 23, 29

*Tohono O'odham Nation v. U.S. Dep't of Interior*,
   No. 4:24-CV-0034, 2024 WL 1639160 n.9 (D. Ariz. Apr. 16, 2024) ..................... 36

*Tohono O'odham Nation v. U.S. Dep't of the Interior*,
   138 F.4th 1189 (9th Cir. 2025) .................................................................. 20, 21, 41

*Tyler v. Cuomo*,
   236 F.3d 1124 (9th Cir. 2000) ............................................................................... 2

*United States v. 0.95 Acres of Land*,
   994 F.2d 696 (9th Cir. 1993) ................................................................................. 2

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1992)............................................................................................. 45

**Statutes**

5 U.S.C. § 702(2)(A).............................................................................................. 21

16 U.S.C. § 470...................................................................................................... 9

28 U.S.C. § 2104(a) .............................................................................................. 23

43 U.S.C. § 1701(a)(7)............................................................................................ 5

43 U.S.C. § 1761.................................................................................................... 5

43 U.S.C. § 1761(a)(4)............................................................................................ 5

54 U.S.C. § 300308................................................................................................. 2

54 U.S.C. § 300320................................................................................................. 2

54 U.S.C. § 302706............................................................................................... 29

54 U.S.C. § 302706(b) ............................................................................................ 3

54 U.S.C. § 304108(a) .................................................................................................. 2

54 U.S.C. § 306108 ...................................................................................................... 2

54 U.S.C. § 306114 ............................................................................................ 4, 10, 24

**Regulations**

36 C.F.R. § 800.1(a) ...................................................................................................... 3

36 C.F.R. § 800.1(c) ...................................................................................................... 4

36 C.F.R. § 800.2(c) ...................................................................................................... 3

36 C.F.R. § 800.2(c)(2)(ii) ...................................................................................... 3, 29

36 C.F.R. § 800.2(c)(2)(ii)(A)-(C) ............................................................................... 4

36 C.F.R. § 800.4(b)(1) .................................................................................................. 3

36 C.F.R. § 800.6 ........................................................................................................ 24

36 C.F.R. § 800.6(c) .................................................................................................... 10

36 C.F.R. § 800.14(b) .................................................................................................... 4

36 C.F.R. § 800.14(b)(1) ................................................................................................ 4

36 C.F.R. § 800.14(b)(1)(ii) .................................................................................... 4, 24

36 C.F.R. § 800.14(b)(2)(iii) ................................................................................. 10, 34

36 C.F.R. § 800.14(b)(3) ...................................................................................... 4, 24, 25

36 C.F.R § 800.16(f) ...................................................................................................... 4

36 C.F.R. § 800.16(*l*)(1) ............................................................................................... 2

43 C.F.R. § 2801.2 ........................................................................................................ 5

43 C.F.R. § 2801.6(a)(1) ................................................................................................ 5

86 Fed. Reg. 30,066 (June 4, 2021) ............................................................................ 14

**TABLE OF ACRONYMS**

| Acronym | Full Name |
|---------|-----------|
| ACHP | Advisory Council on Historic Preservation |
| APA | Administrative Procedure Act |
| ARPA | Archaeological Resources Protection Act of 1979 |
| ASW | Archeology Southwest |
| BLM | Bureau of Land Management |
| EIS | Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| HPTP | Historic Properties Treatment Plan |
| LNTP | Limited Notice to Proceed |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| PA | Programmatic agreement |
| ROD | Record of Decision |
| ROW | Right-of-way |
| SEIS | Supplemental Environmental Impact Statement |
| SHPO | State Historic Preservation Officer |
| TCP | Traditional Cultural Property |

# I.    INTRODUCTION

This case involves the Bureau of Land Management's 2015 approval of a right-of-way for portions of the SunZia Southwest Transmission Line Project (the "Project"). The Project transverses 520 miles of federal, state, and private lands between central New Mexico and central Arizona. At issue here is a portion of the Project that goes through the San Pedro Valley in Arizona—a 50-mile segment located on non-federal land. Following a lengthy good faith consultation process, in which Plaintiff Tribes and Plaintiff Archaeological Southwest participated, BLM complied with its obligations under Section 106 of the National Historic Preservation Act ("NHPA") when it entered into a Project-specific programmatic agreement ("PA") in 2014. Since then, BLM has followed the process outlined in the PA, including when issuing limited notices to proceed ("LNTPs") authorizing construction for the relevant portion in the San Pedro Valley.

Plaintiffs challenge BLM's September 23, 2023 and November 27, 2023 LNTPs under Section 106 of the NHPA and Administrative Procedure Act ("APA"). Pls.' Mem. In Supp. of Mot. for Summ. J. ("Pls.' Br."), Dkt. No. 100-1. Plaintiffs argue BLM failed to make a reasonable and good-faith effort to identify the San Pedro Valley as a Traditional Cultural Property ("TCP"). Their assertions are contradicted by the record. The record reveals that BLM has engaged in extensive consultation efforts with the Tribes and other consulting parties regarding the historic properties, including the San Pedro Valley since 2009. This includes following the processes and obligations in the PA. Plaintiffs had every opportunity to raise their concerns about the San Pedro Valley as a TCP but failed to do so until 2023, eight years after the Project route was set.

For the reasons explained below, the Court should enter judgment for Federal Defendants.

## II.      REGULATORY AND STATUTORY FRAMEWORK

### A.      National Historic Preservation Act

Section 106 of the NHPA requires federal agencies to consider the potential effects of federal agency "undertakings"[1] on historic properties. 54 U.S.C. § 306108. This provision directs federal agencies to "take into account the effect of the undertaking on any historic property" and provide the Advisory Council on Historic Preservation ("ACHP") a "reasonable opportunity to comment with regard to the undertaking."[2] *Id.* Section 106 of the NHPA "is a procedural statute requiring government agencies to 'stop, look, and listen' before proceeding with agency action." *Te-Moak of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 610 (9th Cir. 2010); *see also Tyler v. Cuomo*, 236 F.3d 1124, 1128 (9th Cir. 2000); *United States v. 0.95 Acres of Land*, 994 F.2d 696, 698 (9th Cir. 1993). Section 106 does not prohibit harm to historic properties. 54 U.S.C. § 300308. Rather, it creates obligations that are "chiefly procedural in nature." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2005); *see also Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, 172 F.4th 641, 633 (9th Cir. 2026) (NHPA is "a more general consultation statute"). The NHPA does not "mandate any particular substantive outcome from the consultation process." *Ariz. Mining*, 172 F.4th at 664 (citing *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999)).

The ACHP has promulgated regulations (codified at 36 C.F.R. Part 800) to govern federal agency compliance with Section 106. 54 U.S.C. § 304108(a). The ACHP's regulations set forth a process requiring a federal agency to make a reasonable and good-faith effort to identify historic properties; determine whether identified properties are

---

[1] An "undertaking" is defined broadly to include any "project, activity, or program" that requires a federal permit. 54 U.S.C. § 300320.

[2] A "historic property" is defined as "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places," which "includes properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization and that meet the National Register criteria." 36 C.F.R. § 800.16(*l*)(1).

eligible for listing on the National Register for Historic Places ("National Register"); assess the effects of the undertaking on any eligible historic properties found; determine whether the effect will be adverse; and avoid or mitigate any adverse effects. *Te-Moak Tribe*, 608 F.3d at 607 (quoting *Muckleshoot Indian Tribe*, 177 F.3d at 805)); *see Ariz. Mining*, 172 F.4th at 663 (same).

The regulations contemplate that the Section 106 process will be accomplished through consultation among the agency and other parties with interest in the effects of the undertaking. 36 C.F.R. § 800.1(a). The regulations identify required parties, such as the State Historic Preservation Officers ("SHPOs"), and potentially interested consulting parties, and acknowledge the important role of Indian tribes in the process. *Id.* § 800.2(c). A federal agency must "consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking," *id.* § 800.2(c)(2)(ii), and provide such Indian tribes with a reasonable opportunity to identify historic properties and provide input regarding potential adverse effects on such properties, *id.* § 800.2(c)(2)(ii)(A).[3] *See* 54 U.S.C. § 302706(b). Such consultation should occur "early in the planning process" in a "sensitive manner respectful

---

[3] A subset of historic properties of "traditional religious and cultural importance" is a "traditional cultural property" or "TCP," which may be eligible for listing on the National Register. *Te-Moak Tribe*, 608 F.3d at 608 n.16 (TCPs "describe[] land that Native American tribes have identified as having cultural or religious significance"); *see* AR16125 (National Park Service Bulletin 38); AR11430 (TCP "is a property associated with the historically rooted beliefs and practices of a living community that have been handed down through generations"). While Section 106 does not define historic properties with "religious and cultural significance" nor "traditional cultural properties," agencies may identify these types of historic properties through means such as background research or a cultural resources inventory. *See* 36 C.F.R. § 800.4(b)(1). The mere existence of a cultural resource does not suggest that a property is a TCP or that a discrete location would qualify for listing on the National Register. Identifying a TCP can only occur through consultation with the traditional community, such as a tribe. *See generally Te-Moak Tribe*, 608 F.3d at 607-08. While the regulations lay out how the consultation process should occur to identify historic properties, Section 106 does not mandate that the permitting agency take any particular measures to protect these resources. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 8 (D.D.C. 2016) (citing *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 106-07 (D.C. Cir. 2006)).

3

of tribal sovereignty," and recognizing "the government-to-government relationship between the Federal Government and Indian tribes." 36 C.F.R. § 800.2(c)(2)(ii)(A)-(C). "[C]onsultation simply means the process of seeking, discussing, and considering the views of the other participants, and, where feasible, seeking an agreement" on the Section 106 process. *San Carlos Apache Tribe v. U.S. Forest Serv.*, 803 F. Supp. 3d 879, 940 (D. Ariz. 2025) (quoting 36 C.F.R § 800.16(f)).

In general, a federal agency must complete the Section 106 process "prior to the approval" of the undertaking. 36 C.F.R. § 800.1(c). But the ACHP's regulations provide agencies with flexibility to meet requirements of Section 106 through alternative procedures. *See id.* § 800.14(b)(1). The regulations contemplate "complex projects" where the "effects on historic properties cannot be fully determined prior to approval of an undertaking." *Id.* § 800.14(b)(1)(ii),  (b)(3). Under these circumstances, a federal agency may enter into a programmatic agreement ("PA") "to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings." *See id.* § 800.14(b),  (b)(1). For complex projects, the agency must consult in the development of a PA consistent with the requirements in 36 C.F.R. § 800.6(a)(1)(i)(C), *id.* § 800.14(b)(3), as well as provide for "appropriate government-to-government consultation with affected Indian tribes, *id.* § 800.14(f). An executed PA "shall govern the undertaking and all of its parts." 54 U.S.C. § 306114.

### III.   FACTUAL BACKGROUND

#### A.   Project Overview

In 2008, SunZia Transmission, LLC ("SunZia") applied for a right-of-way to use public lands for the construction, operation, and decommission of up to two 500-kilovolt transmission lines from central New Mexico to central Arizona consistent with the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1761; 43 C.F.R. Part 2800. AR10529. The original right-of-way application identified a proposed route that was 460 miles with approximately fifty percent of the proposal located on BLM-managed lands and

the remaining lands located on private, State, and local lands. AR16090-91. As approved in 2015, the Project consisted of two transmission lines and related facilities in a 520-mile long, 400-foot-wide corridor, of which 183 miles cross BLM lands, 220 miles cross Arizona and New Mexico state trust lands, and 112 miles cross lands owned by private or other entities. AR10529, -31. The area at issue here covers approximately ten percent (a 50-mile segment) of the entire Project through the lower San Pedro Valley. None of the lands within the Project corridor in the San Pedro Valley are BLM-managed public lands.

The Secretary of the Interior has the authority to "grant, issue, or renew rights-of-way . . . for generation, transmission, and distribution of electric energy" on public lands. 43 U.S.C. § 1761(a)(4); 43 C.F.R. § 2801.6(a)(1). Although BLM's decisions related to the Project were only for those portions of the Project under its jurisdiction, BLM considered the effects of the Project to BLM-administered public lands, as well as private lands and lands managed by other agencies. AR10538 (2015 ROD). Under FLPMA, BLM is entrusted with managing public lands for multiple uses, including energy generation and transmission facilities. *See* 43 U.S.C. §§ 1701(a)(7), 1761; 43 C.F.R. § 2801.2; AR10532.

## B.    NEPA Process

Plaintiffs do not bring a National Environmental Policy Act ("NEPA") claim here, but BLM's NEPA process provides important context for the agency's efforts to assess and attempt to resolve potential impacts on historic properties. Beginning in 2009, BLM initiated its environment-review process by preparing an environmental impact statement ("EIS") under NEPA to analyze and disclose potential impacts. AR11099-100. In response to early public outreach, BLM modified elements of the proposal and offered three opportunities for public participation, with public comment periods between June 2009 and June 2010 regarding the scope of the agency's then-forthcoming environmental review. AR11987-91. That process included comments from Plaintiffs relating to the potential location of the Project through San Pedro Valley. AR16027; AR16033 (2010 Scoping Report); AR10534 (2015 ROD). BLM then clearly articulated its intention to consider a

range of alternatives to address, in part, "sensitive areas in the vicinity of . . . San Pedro River Valley." AR16038. BLM also stated that the EIS would address "[i]nventories, impacts, and mitigation to cultural resources," and that consultation under Section 106 "will be ongoing throughout the EIS process." AR16039.

BLM then began cultural resource inventory work to inform both the NEPA and NHPA processes soon after the scoping process. The cultural resource contractor conducted a "lengthy and complicated" Class I inventory (i.e., gathering information from previous cultural resource inventories and recorded sites) covering "a one mile-wide corridor for over 2,000 miles of alternatives across both states." AR14429 (BLM Letter to ACHP). The Draft EIS explains the Class I and II surveys,[4] as well as how these surveys informed the alternatives and the environmental impact analysis. AR19698-705; AR19726-35. In Arizona, the contractor identified and considered 664 previously conducted surveys within the defined area, AR21620-46 (Draft EIS), and identified 518 previously recorded sites, AR21655-86. The Class II surveys included four areas crossing the San Pedro River, which are identified and analyzed in the Draft EIS. AR19733-34. The Draft EIS also analyzed the impact of each potential project alternative. AR19979-20003.

The Draft EIS also detailed BLM's identification and evaluation of cultural landscapes and historic trails within the area of analysis. AR19723-26. Further, the Draft EIS described the tribal consultation meetings and information received from tribes regarding traditional cultural properties, presence of traditional use areas, or those historic properties in which the Project might have visual impacts. AR19735-36. The Draft EIS specifically referenced a BLM consultation meeting with the San Carlos Apache Tribe and White Mountain Apache Tribe on October 4, 2011, in which the tribes raised concerns about potential routes through San Simon and Sulphur Valleys because of the proximity to

---

[4] BLM's guidance defines Class I, Class II, and Class III surveys, providing a detailed explanation on these types of surveys for identifying historic properties. BLM Manual 8110 (Dec. 3, 2004), www.blm.gov/sites/blm.gov/files/uploads/mediacenter_blmpolicymanual8110_0.pdf.

Mount Graham, which the tribes consider to be a TCP of great cultural significance. AR19736; AR19994. This reference also mentions concern about San Pedro Valley due to archaeological and natural resources in the area. *Id.* In evaluating impacts on cultural resources, the Draft EIS also noted the tribal concerns associated with the Project in particular areas, including San Pedro Valley, and the request for detailed maps and/or ethnographic studies. AR19980. The Draft EIS indicated BLM's intent to conduct intensive pedestrian inventories (Class III inventory) "of the selected route, associated access roads, substations, and associated ancillary facilities." AR19979.

In June 2013, BLM published the Final EIS. AR11059. The Final EIS included additional information on cultural resources, including resources within San Pedro Valley as provided by Plaintiff Archaeology Southwest ("ASW"), survey results, and information and concerns provided in additional tribal consultations meetings. AR11425; AR11441-56; AR11470-75; AR11476-77; AR1161-69. The Final EIS provided a comparison of impacts cultural resources between alternatives, AR11245-49; AR11261; AR11752; AR13671, including with a map highlighting the complexity of key issues associated with each alternative. AR11267 (Fig. 2-35). The Final EIS explained BLM's compliance with Section 106 and the connection between the analysis and evaluation of impacts to cultural resources through the Final EIS (and NEPA) and Section 106. AR11431-32; AR11769 (description of post-approval Class III surveys within approved transmission corridors and the use of HPTP as mitigation measures). The Final EIS also responded to comments received on the Draft EIS, including comments from Plaintiffs. *See* 13734-39; AR14115-22. Notably, BLM responded to San Carlos Apache Tribe's comments raising general concerns about the preferred alternative location through the San Pedro Valley and highlighted why the preferred alternative could largely avoid impacts to cultural resources and why other alternatives would lead to greater impacts to those resources. *See, e.g.*, AR13734-35. The comments from San Carlos Apache and ASW did not suggest that the

San Pedro Valley is a TCP despite the Draft EIS clearly identifying the 50-mile route through the Valley as a preferred alternative location for the Project.

### C.    Consultation with Plaintiff Tribes and the Section 106 Process

Relevant here, BLM initiated the Section 106 process at the same time as the NEPA process. AR11996-97 (2013 FEIS) ("The Section 106 process was coordinated with the NEPA process, starting with public scoping."); AR10571 (2015 ROD). In May 2009, BLM contacted twenty-nine tribes, including Plaintiff Tribes, to notify them of the Project, initiate consultation, and invite them to participate as cooperating agencies in preparation of the EIS and in the Section 106 process. AR11124; AR10573; AR11992-93. BLM identified consulting parties for the Project, which includes tribes, SHPOs in Arizona and New Mexico, the ACHP, and other agencies and organizations. AR10571. The Tohono O'odham Nation, San Carlos Apache Tribe, and ASW all actively participated in general Project consultations and as consulting parties for Section 106. AR10571-73; *see* AR16067-74 (ASW 2009 Letter "support[ing] the generation and transmission of renewable energy" and discussing San Pedro Valley as sensitive location for cultural resources, not as TCP). BLM continued to consult Plaintiff Tribes throughout the EIS process, meeting with the Tohono O'odham Nation four times and with the San Carlos Apache Tribe three times between July 2009 and December 2012. AR11993.

Since the Section 106 process includes the identification of historic properties, the process included several inventories. The first was a Class I inventory, which looked at previous cultural resource surveys and sites and identified gaps in field-inventory coverage across both states. AR11424-26, -431 (2013 FEIS); AR10571; *see* AR12634-48 (Class I inventory results in New Mexico); AR12672-96 (Class I inventory results in Arizona). The PA defined a Class I Cultural Resource Inventory as the "[l]arge-scale review of known cultural resource data" or the "[e]xisting data inventory." AR10900. To supplement the Class I inventory, SunZia's cultural contractor conducted a Class II inventory, in which it surveyed select areas where cultural resources would be expected to occur, especially spots

where the Project would cross rivers and historic trails. AR10571-72; AR11426-28 (2013 FEIS). The results of the Class II inventory were combined with the Class I results and submitted to BLM in November 2012. AR10571-72. That information provided an indication of cultural resources site density and informed the selection of the BLM preferred alternative. AR11997. The Class II inventory included two site visits to cultural resource sites in the San Pedro basin in 2012 and 2013, which the Tribal Historic Preservation Officer from the Tohono O'odham Nation attended. *See* AR14484-86; AR11008; *see also* AR10617 (PA defines Class II as a "sample oriented field inventory"). No tribe identified the San Pedro Valley as a TCP during the Class II site visits. AR14484-85; AR11008.

Despite their participation in the NHPA process and with multiple opportunities to do so, at no point during the process did Plaintiffs identify the San Pedro Valley as a TCP or otherwise a property potentially eligible for listing on the National Register. The San Carlos Apache provided comment on the Draft EIS, in which it opposed the selected route because of the potential impacts on culturally sensitive and sacred areas to the tribe and their members and urged BLM to select a route that went through Tucson. AR13734 (explaining the preferred route avoided cultural resources within the Tucson); *see* AR11766, AR14603-04. The comments did not, however, indicate that the entire San Pedro Valley should be identified as an TCP for Section 106 purposes. *Id.* Nor did it provide information that would justify such a finding. *See id.* BLM explained in response that its preferred route would cross the San Pedro River at the same location as the Tribe's preferred route, within an existing transmission line corridor, and that construction along that route would avoid the majority of known cultural resource sites located along the San Pedro River. AR13734. ASW commented on the Draft EIS but likewise did not identify the entire San Pedro Valley as a TCP. AR14115-17. The Tohono O'odham Nation did not submit comments on the Draft EIS, nor did it indicate to BLM that the San Pedro Valley as a whole should be considered a TCP.

## D.    Project-specific Programmatic Agreement

Due to the scope and complexity of the Project, BLM determined early on that the undertaking would have an "adverse effect" on some historic properties. *See* AR14526-27. In accordance with 36 C.F.R. § 800.6(a)(1), BLM notified the ACHP of the "adverse effect" determination. AR14526-27. The ACHP concurred with the determination and agreed to participate in resolving adverse effects. AR10571-72.

In 2014, BLM executed a Project-specific PA to govern its compliance with Section 106. AR10902 ("Compliance with the procedures in the [Programmatic Agreement] will represent satisfaction of the agency's Section 106 responsibilities."). The PA was the result of over five years of consultation with the ACHP, SHPOs, tribes, and other consulting parties on the Project and two years of negotiating the terms of the PA. AR16083-84: AR10942-11003. BLM, the New Mexico and Arizona SHPOs, and the ACHP were signatories to the PA. AR10903-06. Several tribes, including Plaintiff Tribes, participated in consultations for the development of the PA, but declined to sign.[5] AR10913, -19; *see also* AR11038-39 (BLM Letter to Tohono O'odham). ASW signed as a concurring party. AR10928.

Once executed, the PA became the means by which BLM would comply with Section 106. 54 U.S.C. § 306114; 36 C.F.R. § 800.6(c). The PA established procedures to identify historic properties, steps to consider whether the undertaking will adversely affect such identified historic properties, and methods to resolve adverse effects. AR10572; AR10879-81. The PA addressed the identification phase through a cultural resources inventory. AR10880-81. Under the PA, all cultural resources in the area of potential effects would be identified through the inventory report resulting from the Class I record review, the Class II sample surveys and a Class III intensive cultural resources survey, in addition

---

[5] Because the Project did not fall on tribal land, Plaintiff Tribes were not required to sign the PA for it to be properly executed. *See* 36 C.F.R. § 800.14(b)(2)(iii) (requiring a properly executed PA to be signed by the ACHP, agency official, and appropriate SHPOs).

10

to comments from consulting parties, including Plaintiff Tribes and ASW. AR10881 (Stipulation 1.C). SunZia would then prepare a comprehensive inventory report incorporating the findings from those surveys. AR10881-83. The comprehensive inventory report was also to include recommendations on whether certain resources were eligible for inclusion in the National Register and assessments of effects on those resources. AR10881.

The PA required BLM to provide the tribes with the inventory report for a sixty-day review period, specifically so that the tribes could comment on "[w]hether there are any properties of traditional cultural or religious importance to tribes and ethnic groups that were not identified in the inventory and that may be affected by the undertaking." AR10881. BLM would then ensure that those comments were considered in development of the revised inventory report, before resubmitting the report to the tribes and consulting parties for another sixty-day review period. AR10881-82. Once the inventory report was finalized, the PA explained that the report would serve as the "completion of the identification of historic properties" (except for previously unknown properties discovered during future construction). AR10882. The finalized report would also serve as the basis for preparing the Historic Properties Treatment Plan ("HPTP"), which would address the potential effects on the identified properties from construction and how to mitigate those effects. AR10882.

Following identification, the PA outlines the process to avoid and minimize the adverse effects of the Project on those identified historic properties. AR10883. Avoidance measures for historic properties may include realignment of the transmission line, but only within the approved corridor. AR10883. Mitigation could also include other measures, such as monitoring near construction site areas. *Id.* Where avoidance is not possible, BLM minimizes or mitigates adverse effects to historic properties, if possible, with input from consulting parties. AR10883 (Stip. II.B). Part of the resolution of adverse effects is the development of the HPTP. AR10883-84 (Stip. III). The PA also includes a process to address newly discovered cultural resources during construction or operation. AR10572.

### E.    2015 ROD

In 2015—after entry of the PA—BLM issued a Record of Decision ("ROD") documenting its decision to approve the transmission line right-of-way and associated facilities on the portion of the Project on BLM-managed land. AR10524. The ROD set forth the route of the right-of-way and the Project in detail, including a map. AR10534-35 (Figure 1). This route specifically noted the approximately 50-mile segment of the Project through the San Pedro Valley. AR10538. The ROD reflected BLM's consideration of the issues identified and addressed in the Final EIS, which helped identify, refine, and evaluate alternative routes. AR10556 (referring to AR11122-23 (Table 1-3)). It also summarized BLM's consideration of the types of impacts to cultural resources, acknowledging the consultation that would occur with tribes and others through the Project-specific procedures documented in the PA. AR10559-60; AR10571-73. The ROD further reiterated that the PA is necessary "[d]ue to the scope and complexity of the SunZia Project" and BLM cannot determine the effects on historic properties "prior to the approval of [the] undertaking." AR10571-72. The PA establishes the specific process for the Project and that process "will be completed after the ROD and right-of-way permit are issued, but prior to Project construction." AR10571-72.

The ROD did not authorize SunZia to begin construction or proceed with ground-disturbing activities for the Project. AR10538. Construction could only begin after SunZia received written notice to proceed from BLM that confirmed that all pre-construction conditions had been met. AR10538. In accordance with the ROD, BLM issued the right-of-way grant in 2016. AR9189-95.

### F.    2018 Class III Cultural Resources Survey

BLM and SunZia then began with the process set forth in the PA, including the critical component of identifying and evaluating historic properties within the area of potential effects. AR10900. In 2016, SunZia's cultural contractor began conducting a Class

12

III intensive field inventory and submitted it to BLM for review and consultation in 2018.[6] AR2741. As defined in the PA, the Class III survey was an "intensive field survey" which involved "[a] complete surface inventory of a specific area involving a systematic field examination of an area to gather information regarding the number, location, condition, distribution, and significance of cultural resources present, typically requiring a systematic pedestrian review of an area[.]" AR10900; AR10880. In other words, the Class III inventory was an intensive pedestrian survey with 100% ground coverage due to close spacing of survey transects.

During the 2018 intensive field inventory, an archaeological crew joined by field technicians from the Tohono O'odham Nation and the San Carlos Apache Tribe, walked the area of potential effects, including within the San Pedro Valley, to locate and record all cultural resources in the area. AR7742; AR7690; *AR9173 (Class III report).[7] After the survey, inventory reports were provided to the Arizona SHPO and consulting parties, including Plaintiff Tribes, with a sixty-day window for comments. *See* AR7685-86. Of Plaintiff Tribes, only the Tohono O'odham Nation commented on the inventory reports and did not identify a TCP. AR7687. BLM resolved all comments received, and the inventory report was finalized on June 27, 2018. AR7675.

In accordance with the PA, BLM later determined that addendum Class III inventory reports were necessary. AR7563-64 (2018 addendum); AR7673-74 (same); AR3339-43 (2022 addendum). The two addendums followed the same consultation process, which included two sixty-day review periods. *Id.* BLM subsequently received concurrences from the Arizona SHPO in 2018 and 2023, respectively. AR7553-54 (2018 concurrence);

---

[6] In compliance with the PA, BLM sent an initial Class III inventory report for the Arizona portion of the Project to consulting parties, comments were received, and comments were resolved by BLM. AR9179-82.

[7] Some documents in the administrative record contain archaeological information subject to the Archaeological Resources Protection Act of 1979 ("ARPA"), as amended. *See* 16 U.S.C. § 470aa-mm. For the Court's reference, we include an asterisk before the record citations to ARPA-protected documents. *See also* Dkt. No. 99 at 3 n.1.

13

AR2966-70 (2023 concurrence). Along with the Class III inventory report, BLM prepared a separate inventory report for the visual effects assessments to historic properties. *See* AR7409-14; *AR7415-52. The visual effect assessment report was submitted to the Arizona SHPO and consulting parties. AR7409-14. After BLM received and resolved comments, the Arizona SHPO concurred with the report's conclusion. AR7553-54.

Throughout the identification process, which began in 2012 with the Class II survey, and subsequent report reviews, BLM continuously sought comments from the tribes and other consulting parties regarding the adequacy of the inventories, National Register eligibility, assessment of effects, and whether there were any properties of traditional cultural or religious importance to the tribes that had not yet been identified. AR3554; AR3339; AR7685; AR7561. Despite having multiple opportunities to review the Arizona inventory reports, no Plaintiff Tribes identified the entire San Pedro Valley as a TCP. *See* AR7687. But while not required by the PA, Tohono O'odham Nation requested a "cultural landscape study" for the Project separate from the Class III inventory. AR7682-85.

**G.    ROW amendment and 2023 EIS**

In 2020, SunZia submitted an application to amend its existing right-of-way grant. *See* 86 Fed. Reg. 30,066 (June 4, 2021); AR5426-28. SunZia sought to amend four components: (1) route modifications involving BLM-administered land in New Mexico; (2) adding a right-of-way for access roads and temporary work areas outside the granted right-of-way in Arizona; (3) rerouting of a segment of the Project in New Mexico; and (4) adding a substation to convert power from DC to AC. *See* AR2748, -51 (Project overview map); *see also* AR4875-904 (SunZia ROW Amendment Development Report). Of these, the San Pedro Valley (located in Arizona) is implicated only by the second component— access roads and temporary work areas. The access roads and other areas were surveyed for cultural resources, and no historic properties were found. *See* AR1922-23; AR1750. The amendment did not alter or modify the approved transmission line route through the San Pedro Valley. *See* AR2504.

14

BLM prepared a supplemental EIS ("SEIS") to evaluate the environmental impacts of the proposed right-of-way amendment. *See* AR16162-63 (2023 SEIS). The 2023 SEIS did "not revisit or reanalyze the previously analyzed and approved route from 2015 unless conditions have changed that warrant new analysis." AR16163. As part of the NEPA and NHPA processes, BLM conducted outreach to tribes in Arizona and New Mexico notifying them of the new EIS, requesting information, and offering consultation on the amendments to the right-of-way. AR16660-61. Plaintiff Tribes did not respond. AR16661-62 (Table 5-2); *see* AR2511. BLM prepared a Draft SEIS, received and considered public comments on the draft, then published a Final SEIS in February 2023. AR16205.

In January 2023, BLM, the ACHP, the SHPOs, and other consulting parties negotiated and executed an amendment to the PA to add two federal agencies as invited signatories and to include the amended undertaking description reflecting the amended right-of-way. AR3128-43. Otherwise, the stipulations negotiated in the PA remained the same. *See* AR2471-93.

BLM published the ROD for the SunZia right-of-way amendment in May 2023. *See* AR2494-95. Plaintiffs do not challenge the 2023 ROD.

**H.    Efforts to Consult Plaintiff Tribes in 2023**

Over ten years after the 2013 FEIS, eight years after the 2015 ROD, and four years after initiation of the HPTP process, Plaintiff Tribes raised new concerns in response to the 2023 right-of-way amendment. In February 2023, the Tohono O'odham Nation's Tribal Historic Preservation Officer emailed BLM's archaeologist stating for the *first time* that the Tribe regards the San Pedro Valley as a significant TCP, and that the Project "needs" to be moved out of the San Pedro Valley. AR2942-43. In March 2023, the San Carlos Apache Tribe sent a letter to BLM identifying concerns about the Project's route in the San Pedro Valley and stated for the *first time* that "the entire middle San Pedro Valley is a cultural landscape and traditional cultural property[.]" AR2947-49. Both letters requested consultation with BLM. AR2942; AR2949. This correspondence marked the first time

15

Plaintiff Tribes focused on the entire San Pedro Valley as a TCP, rather than discrete areas or historic and archaeological sites within the Valley. *See, e.g.*, AR19205-67; AR19037-86; AR11007-11; AR9174-78; AR4908-5093; AR2971-73.

Though the route had been approved in 2015 and the consulting parties spent years conducting inventories, evaluating properties, and developing treatment plans, BLM reached out to the Tribes to understand more about the area and tribal concerns, pursuant to the PA. *See, e.g.*, AR2545; AR2658. For instance, while preparing a response to Plaintiff Tribes' letters, BLM attempted to contact the chairmen of both Tribes to discuss. AR2544. The Tribes did not respond to BLM's phone calls or messages. *Id.* BLM's archaeologists also reached out to the Tribes twice via email requesting a meeting. AR2443-44.

In June 2023, BLM sent responses to the Tribes. AR1922-24; AR1750-52. BLM's responses explained that BLM evaluated different routing options for the Project between 2012 and 2015, and that the 2015 ROD memorialized that decision and rationale. *See id.* BLM further explained that the PA does not offer the parties re-routing as a resolution or avoidance measure because BLM cannot reconsider the 2015 approval of the Project route. AR1923-24; AR1751-52. BLM's response explained that the NEPA process for the right-of-way amendment was for limited purposes, and the re-routing being considered only covered portions for the Project in New Mexico. AR1922; AR1750. Since the 2016 right-of-way grant, "it became necessary for SunZia to find a different route in New Mexico . . . due to factors concerning the White Sands Missile Range." AR1922; AR1750. BLM noted that the only part of the new NEPA process affecting the San Pedro Valley "involved a total of 25 miles of new access roads and 230 acres of additional ancillary facilities[,]" but that these areas "were surveyed for cultural resources and historic properties were not found." AR1922-23; AR1750. BLM also noted that the three sites related to the Sobaipuru Culture that were identified in the San Pedro Valley will all be avoided by construction. AR1923; AR1750.

## I.    Arizona Historic Properties Treatment Plan Preparation

Further implementing the PA, BLM requested SunZia prepare an HPTP. AR10883-88 (PA). SunZia prepared the HPTP to avoid, minimize, or resolve adverse effects to historic properties. AR9423; AR10560. In accordance with the PA, the process for developing the Arizona HPTP began in 2018 with the finalization of the Class III inventory. *See* AR10883; AR7675. Given this timeline, HPTP development occurred concurrently with BLM's process of reviewing SunZia's right-of-way amendment application.

In April 2023, BLM met with the consulting parties about the PA and provided an update on the Project and explained how BLM was implementing the PA as well as the upcoming process for review of the HPTPs in both states. AR2740-44 (BLM meeting notes). At that meeting, BLM's archaeologist explained that BLM was not revisiting its original routing decision through the San Pedro Valley because the Tribes had not previously raised the San Pedro Valley as a TCP. AR2743-44.

In June 2023, BLM submitted a draft HPTP to consulting parties for an initial review. *AR2010-65. Consistent with the PA, a consultation meeting took place during the 45-day review period in July 2023. *See* AR2009. Representatives for different tribes, including Tohono O'odham Nation, were in attendance. AR1734-42; AR1688-89. The San Carlos Apache Tribe did not attend that call. *Id.* During the meeting, BLM and other consulting parties discussed the proposed treatments for direct effects to most Arizona sites. *See* AR1734-41. BLM also explained that a second HPTP would be developed to resolve the adverse visual and indirect effects to certain properties. AR1734-35. The second HPTP would also address the newly identified San Pedro Valley as a TCP. AR1310; AR1208.

BLM received comments on the draft HPTP from the Arizona SHPO and other consulting parties. *See, e.g.*, AR1697-99 (ASW); AR1704-06 (AZ SHPO); AR1709-11 (Pima County). BLM addressed the comments and sent a revised Arizona HPTP to the

consulting parties for a final 21-day review. AR1490-91. In September 2023, the Arizona HPTP was finalized in consultation with the SHPO, in accordance with the PA. AR1019.

### J.  2023 Dispute Resolution

On August 4, 2023, Plaintiff Tribes and ASW notified BLM that they were invoking the dispute resolution provision in the PA. AR1670-73. Once again, BLM attempted to contact both Tribes but received no response. AR1518 (Aug. 22, 2023 BLM outreach); AR1048-49; AR1188-89; AR1190-91. Despite the Tribes' lack of response, and despite impacts to SunZia's construction schedule, BLM withheld its approval of a limited notice to proceed for construction in the San Pedro Valley to allow more time for the Tribes to respond. *See* AR1038-41; AR1509-17. On September 13, 2023, BLM again reached out to the chairmen of the Tribes inquiring about their interest to meet. AR1044; AR1043. Having received no response, BLM called both Tribes again on September 25, 2023, but yet again did not receive a response. AR1033-34. On September 27, 2023, BLM emailed Plaintiff Tribes and ASW seeking once again to discuss the Project and their invocation of the PA dispute resolution process; but, again, no response. AR1025-26; AR1023-24.

### K.  Relevant Limited Notices to Proceed

Having received no contact from the three disputing parties since the August 4th invocation of the dispute resolution, *see* AR1030-32, BLM issued a LNTP on September 28, 2023,[8] authorizing construction "on segments of the project area crossing state and private lands in the San Pedro Valley" exclusive of areas that were still pending compliance with the Arizona HPTP.[9] *AR1027-29. In issuing the LNTP, BLM determined that the preconstruction terms listed in the ROD had been met. *AR1028.

---

[8] While BLM issued the LNTP on September 26, 2023, the LNTP was not sent to SunZia until September 28, 2023. *See* AR1020-21. We will use the latter date to mitigate confusion.

[9] A separate LNTP covers those portions of the Valley where historic properties were identified through the PA's identification process. AR10889.

On November 1, 2023, Tohono O'odham Nation wrote to the Secretary of the Interior seeking suspension of the September 28, 2023 LNTP and included the San Carlos Apache Tribe and ASW as co-disputing parties. AR0897-901. This letter requested that BLM withdraw or suspend the September 28 LNTP. AR899-900.

On November 8, 2023, as a courtesy to Plaintiff Tribes and ASW, BLM ordered an immediate suspension of construction authorized by the September 28 LNTP so that BLM could meet with the Tribes to discuss their concern that the entire San Pedro Valley is a TCP that had not been properly considered by BLM. AR883-84; AR885-86; AR880-82. BLM met with the disputing parties on November 14, *see* AR796-97, with ACHP in attendance to that meeting. AR0746.

On November 24, 2023, BLM responded to the Tribes in writing. AR753-58. The letter explained that despite BLM's "extensive efforts over many years to elicit information relating to potential historic properties within the Project's area of potential effects," BLM "did not receive sufficient details through consultation or otherwise about the San Pedro Valley to previously consider the Valley, or resources within it, a TCP." AR753-54. The letter clarified that while Plaintiff Tribes and ASW believed that any construction in the San Pedro Valley was an adverse effect that could be resolved only by re-routing the transmission line out of the Valley, BLM "does not have the ability to reconsider the 2015 approval of the transmission line, especially for a segment of the transmission line that is on non-federal land and therefore outside of the BLM's direct jurisdiction." AR754. Re-routing the line out of the San Pedro Valley would "upend both a 2015 BLM decision and one made in 2016 by the Arizona Corporation Commission, decisions that gave SunZia, LLC a valid right-of-way necessary for construction of the transmission line." AR756-57. And though the PA "contemplates avoidance of adverse effects," "avoidance, or even a re-route as contemplated through the [PA], is limited to minor adjustments to the design or construction location, not a complete re-route of a 50-mile segment of the 500-mile plus transmission line." AR757.

19

The letter further explained BLM's disagreement with Plaintiff Tribes' position that they provided BLM with sufficient information to suggest the San Pedro Valley was a potential TCP. AR755. The letter described BLM's multiple attempts to contact Plaintiff Tribes, without response, and stated that even at the November 14 meeting, the Tribes did not provide specifics about the proposed TCP or even describe its exact location or boundaries. AR757. Despite BLM's fundamental disagreement with Plaintiff Tribes' objections, and despite receiving this information late in the HPTP development process, BLM stated that it "genuinely seeks to appropriately mitigate any impacts to a potential TCP," and asked to continue consulting with the Tribes "to evaluate San Pedro Valley and identify appropriate measures to address any adverse effects." AR757.

On November 27, 2023, BLM notified Plaintiff Tribes that the suspension of the September 28 LNTP would be lifted, and it was reissued later that day. AR741-43.

**L.    Procedural History**

In January 2024, Plaintiffs filed this suit challenging BLM's September 28, 2023, and the reissued November 27, 2023 LNTPs under the NHPA and APA. Compl., Dkt. No. 1. The Court dismissed the Complaint for failure to state a claim. Dkt. No. 67. Plaintiffs appealed. Dkt. No. 68.

The Ninth Circuit reversed and remanded. *See* Dkt. No. 71; *Tohono O'odham Nation v. U.S. Dep't of the Interior*, 138 F.4th 1189 (9th Cir. 2025). The Court made three conclusions. First, although Plaintiffs' Complaint could be interpreted to raise two NHPA challenges, the panel determined that Plaintiffs' only preserved challenge is whether BLM failed to meet certain of its NHPA obligations under the PA. *Tohono O'odham*, 138 F.4th at 1199 ("Plaintiffs expressly disclaim *any* challenge to the ROD or the terms of the PA and so abandon their first challenge."). Second, the Court concluded that the LNTPs here constitute final agency action, and thus Plaintiffs' NHPA claim is timely and reviewable under the APA. *Id.* at 1201-02. Third, when construing the Complaint's allegations in

Plaintiffs' favor, the Court determined that Plaintiffs plausibly alleged that BLM failed to comply with the PA in two ways. *Id.* at 1202-03.

The Ninth Circuit held that the Complaint raised a plausible claim by alleging that "since at least 2009, the BLM knew that the tribes considered the San Pedro Valley to be a TCP[,]" BLM assured the consulting parties that it would evaluate the Valley under a second HPTP, and then "failed to provide a second Treatment Plan to the Consulting Parties." *Id.* at 1203. "Because Plaintiffs plausibly allege that the Valley is a TCP," the Court "infer[red] that a proper consultation via the Treatment Plan process would have resulted in the Valley's designation as a historic property." *Id.* And Plaintiffs had plausibly alleged an NHPA claim because "[a]s claimed by Plaintiffs," BLM "authorized construction without properly identifying the Valley as a TCP." *Id.* The Court rejected Federal Defendants' arguments that the 2018 inventory report forecloses Plaintiffs' challenge at the pleading stage. *Id.* Construing the allegations in Plaintiffs' favor, and without the benefit of the record before it, the Ninth Circuit acknowledged that it was unclear on how the identification process worked under the PA. *Id.*

Despite "disclaiming" any challenge to the ROD, *id.* at 1199, 1203, Plaintiffs did not amend their Complaint on remand. In the operative complaint, Plaintiffs seek a judgment that, among other things, "[d]eclare[s] unlawful, vacate[s], and set aside[s] the September 27, 2023 and November 27, 2023 LNTPs and underlying right-of-way authorization for the Project in the middle and lower San Pedro Valley[.]" Compl. at 63.

## IV.    STANDARD OF REVIEW

Judicial review of agency decisions under the NHPA is governed by the APA, 5 U.S.C. §§ 701-706. *San Carlos Apache Tribe*, 417 F.3d at 1099; *Ctr. for Biological Diversity v. Esper*, 958 F.3d 895, 903 (9th Cir. 2020). Because the APA governs, judicial review of a claim challenging Section 106 compliance focuses on whether an agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 702(2)(A). Plaintiffs bear the burden of proving that the agency's actions were

21

arbitrary and capricious. *San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860, 885 n.16 (D. Ariz. 2003). Under the APA's deferential standard, the question is whether the agency's consultation efforts fell "within a zone of reasonableness." *San Carlos Apache*, 803 F. Supp. 3d at 944  (quoting *Prometheus Radio Project*, 592 U.S. at 423). The Court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). The Court instead must "consider whether the decision is based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

## V.    ARGUMENT

BLM is entitled to summary judgment. The record demonstrates BLM's lengthy and thorough consultation efforts to identify historic properties and TCPs, including within the San Pedro Valley. BLM complied with Section 106 when it executed the PA in 2014 before approving the Project in 2015. And BLM continued to engage in good faith consultation efforts with Plaintiffs and complied with the PA before issuing the LNTPs.

Plaintiffs attempt to rewrite the story by misconstruing the facts and extensive Section 106 process. They claim they told BLM that the entire San Pedro Valley was a TCP early and "repeatedly" throughout the process and chastise BLM for proceeding with the preferred alternative through the San Pedro Valley. But Plaintiffs had ample opportunities to raise their specific concerns about the entire San Pedro Valley as a potential TCP during the initial scoping period, the Draft EIS, the Final EIS, and the multiple consultation meetings and correspondence along the way all before BLM approved the right-of-way setting the location of the corridor for the transmission line route. They failed to do so. The PA process continued after BLM's 2015 decision. Yet Plaintiff Tribes still did not identify the San Pedro Valley as a potential TCP during the PA process for historic property identification. Instead, they waited five years after the

22

identification phase concluded and eight years after the route was set to raise for the first time that they consider the entire San Pedro Valley to be a TCP.

Setting aside the fact that the record disproves Plaintiffs' factual theory, Plaintiffs also misconstrue BLM's limited authority under the PA to fundamentally change the approved Project. There is no reasonable interpretation of BLM's 2015 approval and the PA that places relocation of the 520-mile Project, including the route through the San Pedro Valley, as open for reconsideration during the PA's consultation processes. Thus, even if Plaintiffs had timely suggested that the entire San Pedro Valley was a TCP during the PA's identification process, and even if BLM had agreed that it was in fact a TCP, a complete re-route out of the San Pedro Valley is not a viable resolution. Had Plaintiffs wanted to "avoid" adversely affecting San Pedro Valley, the time to raise that concern was during the decision-making process leading to BLM's 2015 ROD. And the time to challenge that decision would have been within six years of that ROD. 28 U.S.C. § 2104(a). The Court should reject their untimely, backdoor efforts to challenge the 2015 decision. Even more now that construction is complete and much (if not all) of Plaintiffs' requested relief is simply no longer available.

## A. BLM complied with the National Historic Preservation Act.

Because any challenge to BLM's decision to issue the ROD in reliance on the PA is untimely, the only NHPA issue here is whether BLM complied with the PA before issuing the LNTPs. The answer is yes.

The NHPA is a procedural statute, it does not mandate any particular outcomes. *Te-Moak*, 608 F.3d at 610. Nor does it prohibit harm to historic properties. *San Carlos Apache*, 417 F.3d at 1971; *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 8 (D.D.C. 2016) (Section 106 "does not mandate that the permitting agency take any particular preservation measures to protect these resources."). When there is a properly executed PA before the approval of the undertaking, as here, the agency's NHPA

obligations are governed the PA. 54 U.S.C. § 306114; *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1216 (9th Cir. 2008); 36 C.F.R. §§ 800.6, 800.14(b)(3).

As explained in more detail below, BLM complied with the PA which, in turn, constitutes BLM's compliance with the NHPA. Although Plaintiffs may be dissatisfied with the outcome that resulted from the multi-year tribal consultation process, such dissatisfaction does not render the Section 106 process itself insufficient. *San Carlos Apache*, 803 F. Supp. 3d at 944.

**1. Plaintiffs fundamentally misunderstand the purpose of the 2015 ROD.**

As a primary matter, Plaintiffs seemingly confuse the Section 106 process and the NEPA process, and they fundamentally misunderstand the function of the 2015 ROD. *See, e.g.*, Pls.' Br. 37-38 ("BLM voluntarily elected to defer the time- and resource-intensive steps of Section 106 consultation until *after* it selected the preferred route under NEPA."). BLM's 2015 decision granting the right-of-way and setting the Project route not only represented the conclusion of the NEPA process, it concluded BLM's decision-making process under FLPMA, which, once BLM executed the final right-of-way grant, provided SunZia with a right to construct and operate the transmission line (at least with respect to public lands). BLM could only issue that decision because it complied with all applicable laws, including Section 106 of the NHPA. AR11428-32 (2013 FEIS); AR10569 (2015 ROD); *see also Mid States Coal. for Progress v. STB*, 345 F.3d 520, 554-55 (8th Cir. 2003). For complex projects, as is the case here, BLM is permitted to defer identification of historic properties until after it approves an undertaking if it is provided for in an executed PA. 36 C.F.R. § 800.14(b)(1)(ii), (b)(3). BLM complied with the NHPA prior to approving SunZia's right-of-way when it executed the PA before making the right-of-way decision in the 2015 ROD. Despite Plaintiffs' labels, this was not deferral of the right-of-way. Pls.' Br. 30. Rather, BLM made a decision to approve an undertaking (granting the right-of-way) in 2015 then issued that grant to SunZia in 2016. BLM did not defer the right-of-way, it deferred its final identification of historic properties along it. *See* AR10572 (2015 ROD).

Plaintiffs also misrepresent the ACHP's position on an agency's Section 106 compliance when issuing NEPA documents. *Id.* at 37. They posit that "the ACHP admonishes agencies deferring Section 106 compliance to 'avoid issuing NEPA documents [e.g., RODs] that present a final agency decision before they have completed their Section 106 process because the Section 106 process may result in a [subsequent] finding that requires the NEPA document to be revised or supplemented.'" *Id.* (quoting from non-record website) (emphasis omitted). But that is not the case here because BLM satisfied Section 106 by entering into the PA *before* issuing its decision in 2015. *Snoqualmie Indian Tribe*, 545 F.3d at 1216; *see* 36 C.F.R. § 800.14(b)(3). Plaintiffs' reliance on ACHP comments made *before* the PA was executed also does not prove their point. Pls.' Br. 37-38. Indeed, BLM worked with the consulting parties to finalize the Project-specific PA and the ACHP was a signatory. AR10906.

Plaintiffs conveniently ignore the significant consultation efforts that preceded the PA and the 2015 decision that set the route. BLM consulted the tribes and considered all those efforts when determining the final route based on the PA. Plaintiffs' logic that "the route could not have been 'set' as a final matter" in 2015, Pls.' Br. 39, ignores BLM's use of the PA process explicitly authorized by law. *San Carlos Apache*, 803 F. Supp. 3d at 944.

### 2. The record reveals BLM's considerable consultation efforts leading up to the PA and the 2015 ROD.

Even though Plaintiffs cannot challenge the route selection in the 2015 ROD or BLM's reliance on the PA in making that decision, the consultations leading up to that decision provide important context. BLM engaged in reasonable efforts to consult Plaintiffs over many years beginning in 2009, well before implementing the PA or finalizing the Project's route in 2015. *See, e.g.*, AR11040-41 (2013 BLM letter). Plaintiffs' assertion that BLM's consultation efforts were inadequate, *see* Pls.' Br. 42-45, is simply belied by the record. They try to paint a false picture of inadequate consultation by

repeatedly complaining that BLM "deprived" the Tribes of a meaningful opportunity to consult early. Pls.' Br. 42-45. The record shows a different picture.

Contrary to Plaintiffs' arguments, BLM's efforts to identify historic properties, especially those with landscape-level significance to Tribes, began well before the execution of the PA or BLM's approval of the right-of-way in 2015. BLM initiated tribal consultation under the NHPA and NEPA, provided SunZia's proposal and a map, and specifically requested information from Tribes on "resources or places of traditional cultural or religious importance to members of your tribe that might be affected by the proposed action." AR16088. BLM also met with tribes early in the NEPA scoping process to describe the proposal, and to request information and concerns, all in order to achieve better results in choosing the transmission line route. *See, e.g.*, AR16080 (Tohono O'odham consultation meeting where tribe suggested BLM conduct ethnographic overview for the entire project); AR16065; AR14530; AR14498. Those efforts continued through development of the EIS and PA. *See, e.g.*, AR14575-76; AR14563-66; AR14498-501AR11030-31. The tribes also provided early information about SunZia's proposed route through San Simon and Sulphur Springs Valleys due to the proximity to a listed TCP, Mount Graham, as well as routes near the San Pedro River due to archaeological and natural resources. AR14599-600. BLM considered this information in developing the EIS. AR11425; AR11441-56; AR11470-75; AR11476-77; AR1161-69.

### 3. BLM's consultation efforts continued throughout the PA process.

The record also shows BLM's consultation efforts continued as it implemented the PA. Stipulation 1.A established the area of potential effects (including direct, indirect, and cumulative) to identify historic properties. AR10879-80. Stipulation 1.B directed the completion of a cultural resources inventory to identify historic properties that could be affected by the Project within the area of potential effects defined in Stipulation 1.A. AR10880. This required SunZia to prepare a comprehensive inventory report, starting with the Class I and Class II inventories prepared in support of the EIS, and the Class III field

26

intensive inventory, which would be conducted with sensitivity for non-archaeological locations. *Id.*; *see also* AR14502 (explaining the Class I and Class II inventory was a "time-consuming process").

Stipulation 1.C. and 1.E directed that the comprehensive inventory report incorporate the survey findings, which would also include National Register eligibility recommendations and assessments of indirect, indirect, and cumulative effects. AR10881. The comprehensive inventory report: (1) identified historic properties within the defined area of potential effects; (2) determined National Register eligibility; (3) determined effects to historic properties; and (4) recommended treatment measures. AR10881-82. Stipulation 1.D required BLM to provide the comprehensive inventory report to the concerned tribes and other parties for a sixty-day review and comment, including "[w]hether there are any properties of traditional cultural or religious importance to tribes and ethnic groups that were not identified in the inventory and that may be affected by the Undertaking." AR10881; AR9406-20; AR7685-87; AR7673-74.

After this review and comment period, pursuant to Stipulation I.D.4, BLM was to provide a revised comprehensive inventory report to the SHPOs, tribes, and consulting parties with a sixty-day review and request SHPO concurrence on (1) National Register eligibility and (2) BLM's assessments of effects on those identified historic properties. AR10881; AR7673-74; AR9179-82; AR7563-64; AR7559-62. Stipulation 1.B.2.d also required SunZia to assess visual impacts for the historic properties within the direct and indirect area of potential effects that are considered to be visually sensitive and potentially affected by the Project. AR10881. Other than with respect to historic properties identified in possible future discoveries (e.g., via excavation), the inventory report signified the completion of the identification phase. AR10881.

The record demonstrates BLM's compliance with the inventory requirements in the PA. First, SunZia conducted the Class III field intensive survey leading to the draft comprehensive inventory report. Plaintiff Tribes participated in the extensive Class III

survey in 2018 where they, alongside cultural resource specialist, walked the area of potential effects, including the San Pedro Valley, to locate all cultural properties in the area. In February 2018, BLM provided the revised comprehensive inventory report, AR7676, -90, which incorporated earlier comments from the Tribes and other consulting parties, *see, e.g.*, AR9179. BLM received final comments and then received concurrence from the Arizona SHPO. AR7675, -78, -80, -85. BLM provided an addendum to the revised comprehensive inventory report in September 2018. AR7559. SunZia prepared the visual impacts assessment consistent with the PA, AR7415, and BLM provided the draft assessment to the consulting parties, AR7399; AR7383, -94. The Arizona SHPO concurred with the visual impacts assessment. AR7406. BLM issued the final visual impacts assessment in March 2019, which incorporated comments from consulting parties. AR7260; AR7131. BLM also provided revisions to the report and assessment to capture resources issues or concerns not covered in the early versions. *See, e.g.*, AR7563; AR6856.

At no time during the PA's identification process did the Tribes identify any TCP in the San Pedro Valley. Even after the comprehensive inventory report was provided to the consulting parties for review and comment. AR7673-74, the Tribes did not identify any TCPs within the San Pedro Valley. Nor did the Tribes suggest that the entire San Pedro Valley was potentially a TCP. As described in the PA, the inventory process was critical to the identification effort and subsequent treatment plan process. AR10882. More importantly, it served as another opportunity for the Tribes to raise any concern and to comment upon, among other things, whether any properties of traditional cultural or religious importance were missing from the inventory. *See* AR10882. And the PA did not require BLM to conduct "detailed ethnographic stud[ies]" separate from the Class III survey, as Plaintiffs suggest. Pls.' Br. 23-24. Once the SHPO concurred with the inventory report, AR7553-54, the identification process in the PA concluded.

The record reveals not only an enormous effort on BLM's part to identify historic properties that may be affected by the approved undertaking, but numerous opportunities

for the consulting parties to raise concerns about specific historic properties, including TCPs, within the defined area of potential effects. Plaintiffs' attempt to analogize BLM's effort here to other cases, *see, e.g.*, Pls.' Br. 27-28, is unavailing. The record makes clear that despite ample opportunity to identify a TCP, at no point during the inventory phase did Plaintiffs state (or even suggest) that any tribe considered the entire San Pedro Valley to be a TCP. *See, e.g.*, *AR11007-11; AR11014-15; AR11030-31; AR11033; AR11038-39; AR11055-58; AR14479-83; AR14484-86.[10] And more importantly, the record illustrates that BLM did consult Plaintiff Tribes about identifying TCPs. BLM complied with the PA. *See Te-Moak Tribe*, 608 F.3d at 610 (finding agency complied with its consultation obligations when the record shows a multi-year tribal consultation effort to identify cultural resources within the project area). And contrary to Plaintiffs' assertion, Pls.' Br. 28, the Class III inventory was not exclusively archaeological. The PA explicitly expressed that the field extensive inventory would be "conducted with sensitivity for non-archaeological locations or other features identified as important trough tribal consultation or ethnographic studies." AR10880.

Plaintiffs also overplay the fact that the Tribes identified the San Pedro Valley as a cultural landscape. Courts have certainly interpreted "properties of traditional religious and cultural importance" to tribes as synonymous with a TCP. *See, e.g.*, *Te-Moak Tribe*, 608 F.3d at 608 n.16; *see also* 54 U.S.C. § 302706; 36 C.F.R. § 800.2(c)(2)(ii). But that does not mean that the PA obligated *BLM* to discern from generalized references to cultural landscapes across the entire Project that the Tribes viewed the San Pedro Valley as a culturally significant historic property for purposes of the NHPA. Pls.' Br. 23-24. Even more so when, as here, a list of historic properties was created and shared with the Tribes so they could confirm or dispute the accuracy of the list. BLM lacks the requisite expertise

---

[10] *See also* AR14489-90; AR11493-94; AR14489-90; AR14493-94; AR14498-501; AR14502-05; AR14512-15; AR14516-21; AR14530-57; AR14555-57; AR14563-66; AR14574-75; *AR14599-601; AR14603-05; AR16044-45; AR16046-47; AR16065-66; AR16075-76; AR16077-78; AR16080-81; AR16087-89.

to identify TCPs or properties with religious and cultural significance. Only a tribe possesses the special knowledge and information to identify its own TCPs. *Battle Mountain Band of Te-Moak Tribe of W. Shoshone Indians v. U.S. Bureau of Land Mgmt.*, 302 F. Supp. 3d 1226, 1237 (D. Nev. 2018). And for good reason because only "those individuals and groups who may ascribe traditional cultural significance to [the] location" have the "special knowledge" to do so. AR16131. Indeed, in a 2023 letter, ASW even recognized "that organizations other than Tribes rarely possess the 'expertise and information' required to identify TCPs." AR2972 (agencies "are advised to defer to Tribes when it comes to TCP identification"). The Court should reject Plaintiffs' invitation to shift responsibility to the federal agency to identify the tribe's TCP under these circumstances.[11]

### 4.    Plaintiffs misrepresent the record to fit their faulty premise.

Despite all the above, Plaintiffs assert that there were "at least forty-four documented occasions" when they "informed" BLM that the San Pedro Valley was a "TCP and cultural landscape." Pls.' Br. 24. This assertion mischaracterizes the record. In an effort to support the point, Plaintiffs repeatedly offer partial quotes of documents or take the documents out of context. *See id.* at 24-26 n.17. Indeed, even the distorted summaries in Plaintiffs' footnote seventeen illustrate none of the "forty-four occasions" before 2023 actually include a statement asserting that the entire San Pedro Valley is a TCP. And none explain why the Tribes did not raise the issue of the San Pedro Valley's TCP status in response to the inventory report, as set forth in the PA.

The record citations listed in Plaintiffs' footnote seventeen fall into four categories: (1) pre-ROD scoping and protest letters; (2) post-PA requests for a cultural landscape

---

[11] Plaintiffs argue that BLM was "acutely aware" of its "obligation to investigate TCPs" because a cultural landscape study was an "explicit condition" of SunZia's certificate from the Arizona Corporation Commission, Pls.' Br. 33-34 n.24. But that certificate has no bearing on BLM's obligations under the PA (or the NHPA), and BLM did not participate in the Arizona Corporation Commission process.

30

study; (3) comments on the 2023 right-of-way amendment (which Plaintiffs do not challenge); and (4) Plaintiffs' 2023 invocation of the PA's dispute resolution provision.

Pre-ROD scoping and protest letters. Before the 2015 ROD selecting the route, Plaintiffs and other interested parties sent scoping comments and protest letters to BLM as it considered alternatives. These letters, at best, generally express that the San Pedro Valley area is important to the Tribes. None assert that the entire Valley is a TCP or historic property. See, e.g., AR16070-73 (ASW 2009 letter discussing cultural significance to the "lower San Pedro Valley"); AR126052 (ASW 2009 letter suggesting "lower San Pedro River Valley" is "recognized for the significance of its intact cultural and natural landscape"); AR15404. Many of the pre-ROD scoping comments suggested that the "lower" San Pedro Valley may be a cultural landscape—a geographic modifier not defined in Plaintiffs' scoping and protest letters, and a distinction not addressed by Plaintiffs now. And notably absent from Plaintiffs' footnote seventeen is Tohono O'odham Nation's letter to BLM stating that "much" of the Project right-of-way in Arizona is "located on the Traditional-Use Lands" that makes no mention of the San Pedro Valley being a TCP. AR11058. Moreover, BLM considered all these scoping and protest comments when it decided upon the line's location in 2015. And any argument that BLM failed to adequately consult the Tribes or identify historic properties before the 2015 decision is time-barred.

Post-PA cultural landscape study requests. Plaintiffs' footnote seventeen identifies several post-PA generalized requests for a cultural landscape study. But inquiring about when BLM intended to start the cultural landscape study do not equate to an identification of the entire San Pedro Valley as a TCP. Nor does requesting such study for the Project (not exclusive to the San Pedro Valley) suggest, much less inform, BLM that the entire San Pedro Valley is a TCP. See, e.g., AR7685 (2018 email from the Tohono O'odham inquiring "when do you plan to start the cultural landscape study for SunZia"). For instance, a 2017 email from Tohono O'odham Nation stated that "[t]his proposed line will have significant adverse effects on the cultural landscape of the project area[,]" and "numerous sites

31

significant to the Tohono O'odham Nation in the San Pedro River Valley may be impacted," but the Tribe makes no statement of the location of those sites and no statement that the entire San Pedro Valley is a TCP. AR9174.

Even still, the PA—the means for BLM's Section 106 compliance—does not require BLM to conduct a cultural landscape study. *See* AR100876-95. BLM elected to prepare the study separate from the Class III inventory and that "[a]ny integration" of the cultural landscape study "will occur for the treatment phase." AR7687 (2018 comment resolution table from BLM).

The generalized notion that a vast swath of land constitutes a cultural landscape does not provide information sufficient for deeming it a TCP, as Plaintiffs appear to suggest. Pls.' Br. 33-34. "That a general unbounded and imprecisely located area has important cultural significance is not enough." *Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223, 1232 (9th Cir. 1999); *see id.* ("That important things happened in a general area is not enough to make the area a 'site.'"). Plaintiffs do not provide any countering authority to support a conclusion that a cultural landscape (or request for a cultural landscape study) is necessarily the identification of a TCP or other property eligible for the National Register. Existing policies do not equate the term "cultural landscapes" with a "TCP." *See, e.g.*, AR16135 (National Park Service Bulletin 38 explaining that "culturally significant natural landscapes" could be considered a "site" that may be a "property" covered by NHPA regulations); AR16144 (NPS Bulletin 38 describing challenges in defining the boundaries of a TCP). The PA defines "cultural resources" to include sites and landscapes, but is careful to provide in this definition that "[c]ultural resources" is "[a]ny location of human activity, occupation, or use identifiable through field inventory, historical documentation or oral evidence," enforcing BLM's position that identification of a cultural resources requires information such as oral evidence, to be submitted during BLM's preparation of surveys. AR16135. Plaintiffs provide no support showing they offered more than "vague notions of a potential cultural landscape." *See* Pls.' Br. 30-31. And if Plaintiffs had intended

32

their references to a cultural landscape to be requests for the entire San Pedro Valley to be treated as a TCP, they surely would have identified the Valley's absence from list of historic properties developed under the PA.

BLM acknowledged and identified "cultural landscapes" before issuance of the 2015 ROD, where it had the information, it needed to identify the cultural landscape as existing within a National Register-listed locations. AR11456-57 (2013 FEIS identifying Gran Quivira as a "cultural landscape" that is a "contributing component" of a National Register-listed monument).

Plaintiffs rely on BLM's response to a 2012 comment by the NPS as the "most salient evidence" of their position that BLM "dismissed comments identifying a potential cultural landscape in the San Pedro Valley[.]" Pls.' Br. 31-32. But NPS did not address BLM's evaluation of the San Pedro Valley (as a TCP or otherwise). AR21715 (NPS 2012 Letter). NPS's comments do not mention the San Pedro Valley. AR21715-16; *see, e.g.*, AR21718. NPS stated "[c]onsultations also needs to occur related to the Gran Quivira unit as a sacred site and potentially a Traditional Cultural Property (TCP) with significance under NHPA." AR21718. It was BLM's response (not NPS's comment) that stated the San Pedro Valley was "an area of concern for resource gathering" based on information BLM received from "several scoping meetings[,]" which tribes attended. AR21718. NPS did not criticize BLM's efforts, it was quite the opposite: NPS "commend[ed]" BLM "for the thought and effort put into both the Administrative and Draft EISs." AR21715; *but see* Pls.' Br. 25 n.17.

Unrelated right-of-way amendment. This group of citations in Plaintiffs' footnote seventeen refer to comments on the 2023 right-of-way amendment that was unrelated to the San Pedro Valley. *See, e.g.*, AR2947-49 (2023 San Carlos Apache letter concerning ROW amendment); AR2943-43 (2023 Tohono O'odham letter concerning ROW amendment); AR2933 (2023 meeting discussing ROW amendment and cultural resources in San Pedro Valley); AR2792-93 (2023 ASW protest letter on ROW amendment);

33

AR2743-44 (2023 consulting parties meeting). The amendment was a narrow amendment to the existing right-of-way that did not modify the right-of-way on BLM-managed land near the San Pedro Valley nor alter the route. AR16154. Plaintiffs are trying to use the NEPA scoping process for the limited 2023 right-of-way amendment primarily affecting land located in New Mexico to revive their challenge to the 2015 ROD that affected land in the San Pedro Valley in Arizona. AR4926.

It is true that two comments from 2023 advised BLM to give special consideration to the vital importance of the "Rio San Pedro" as a likely cultural landscape. AR4926, -42; AR5014-15, -41. It is also true that, in the context of the right-of-way amendment, Plaintiff Tribes claimed that the San Pedro Valley is a TCP and requested that BLM move the Project out of the Valley. *See, e.g.*, AR2947-49 ("We repeat our request for a thorough re-consideration of the alternative routes . . . ."); AR2942-43 ("The SunZia Transmission Line construction right-of-way needs to moved out of the San Pedro Valley[.]"); AR2943 (BLM "needs to resume consultations with the affected Tribes . . . with the goal of moving the proposed Sun Zia Transmission line out of the valley."). But these comments were made *after* the identification process under the PA had concluded. And, again, the amendment did not modify the existing right-of-way through the San Pedro Valley. They do not support an argument that BLM failed to comply with the PA. BLM's compliance with the procedures established in the PA satisfies its Section 106 responsibilities. 36 C.F.R. § 800.14(b)(2)(iii) .

Plaintiffs' reliance on BLM's comment response in the 2023 SEIS for the right-of-way amendment also does not support their position. Pls.' Br. 31 (complaining that "BLM arbitrarily dismissed comments identifying a potential cultural landscape in the San Pedro Valley" (citing AR13863)). These comments, too, were after and outside the context of the PA's property identification process. And again, the right-of-way amendment was limited and did not reassess the entire San Pedro Valley in the first instance. BLM disclosed that the only part of the new NEPA process that affected the San Pedro Valley was limited to

34

new access road and additional ancillary facilities. AR13863. For those limited component affecting the Valley, BLM explained that "[n]o historical landscapes or cult[ural] geographies were located in the area during the record check." AR13163; AR1467-68.

Dispute resolution. Finally, the fourth group of citations in Plaintiffs' footnote refers to comments and criticisms made during Plaintiffs' 2023 invocation of the PA's dispute resolution process. *See, e.g.*, AR2971-73 (2023 ASW letter); AR2942-43. These citations simply reiterate the point that 2023 was the very *first* time—and after the process set forth in the PA—that Plaintiff Tribes raised the entire San Pedro Valley is a TCP. *See* AR10882 (PA); AR2743 (2023 consulting parties meeting discussing Project timeline). Plaintiffs do not point to any of the "detailed comments" that "alerted" BLM to the San Pedro Valley's purported status as a TCP before 2023. Pls.' Br. 27-28. Even Plaintiffs' brief fails to describe with any specificity the boundaries of a potential TCP spanning the entirety of the San Pedro Valley. And Plaintiffs ignore the fact that BLM *did* evaluate portions of the San Pedro Valley for National Register eligibility as a TCP. AR869-70 (2023 Amended LNTP).

To be clear, BLM does not dispute the existence of tribal connections to the San Pedro Valley, nor does it dispute that a TCP *may* exist. BLM has acknowledged the existence of significant discrete historic sites, even TCPs, within the San Pedro Valley. *See* AR14503-04 (BLM recognizing cultural sites at the San Pedro crossing). BLM has also recognized the tribes' historic and cultural connection to the Valley. *See, e.g.*, AR11438-56 (2013 FEIS discussing cultural resources). The fundamental issue here is that Plaintiffs did not identify the entire San Pedro Valley as a potential TCP until 2023, after the identification process in the PA. This was true despite the fact consultations began in 2009. And even Plaintiffs were clear in their intent, they did not provide (and still have not provided) BLM with any information about the size, location, or nature of the San Pedro Valley as would be necessary to identify the boundaries of it as a TCP or to determine its eligibility.

Plaintiffs rely on an incongruous and out-of-circuit decision, *Pueblo of Sandia v. United States*, 50 F.3d 856 (10th Cir. 1995). Pls.' Br. 27-28. There, the agency determined the project area canyon did not contain any TCPs despite the tribe providing detailed ethnographic overview of the tribe's religious and cultural connections to the canyon. *Pueblo of Sandia*, 50 F.3d at 857, 879. The court concluded the agency should have engaged in further investigations after receiving information from the tribe about a TCP during the Section 106 process. *Id.* Nothing about the *Pueblo of Sandia* case resembles the facts here, except that the court reached the conclusion Plaintiffs seek now. Unlike in that case, Plaintiffs simply stated to BLM that the San Pedro Valley was a "cultural landscape." No other comments or documents about the Valley were (or have been) provided to BLM. And as this Court already recognized, BLM provided ample opportunities for Plaintiffs to comment on the adequacy of BLM's identification efforts and the SHPO concurred with BLM's findings. *Tohono O'odham Nation v. U.S. Dep't of Interior*, No. 4:24-CV-0034, 2024 WL 1639160, at *9 n.9 (D. Ariz. Apr. 16, 2024).

Plaintiffs' case is more analogous to *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800 (1999). There, the Ninth Circuit found NHPA compliance where the record demonstrated the agency made reasonable and good-faith effort to identify historic properties despite the tribe's concern about inadequate involvement in the identification process. *Id.* at 806-07. Thus, contrary to Plaintiffs' statements, the record shows BLM satisfied its consultation obligations to identify all historic properties, including TCPs and those having landscape-level significance. Because BLM made reasonable and good faith consultations efforts and properly implemented the PA, it complied with its NHPA obligations. *See Quechan Tribe of Fort Yuma Indian Rsrv. v. Dep't of the Interior*, 927 F. Supp. 2d 921, 930-33 (S.D. Cal. 2013), *aff'd,* 673 F. App'x 709 (9th Cir. 2016) (finding sufficient Section 106 consultation where the agency continued to engage in good faith consultation efforts with the tribes); *Reno-Sparks Indian Colony v. Haaland*, 663 F. Supp. 3d 1188, 1196-98 (D. Nev. 2023) (same). Plaintiffs fail to show BLM violated its NHPA

obligations. BLM's extensive consultation efforts are entitled to deference. *San Carlos Apache*, 803 F. Supp. 3d at 944 (citing *Fed. Communications Commission v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

**5.    BLM otherwise complied with the PA before issuing issued the LNTPs.**

BLM implemented and complied with the requirements in the PA when it issued the LNTPs. As explained above, BLM has completed the site inventory (including sharing the inventory for comment with Plaintiffs) and the SHPO concurred with the final list.

Following the identification process, the PA required BLM to consider measures to avoid, where possible, and minimize adverse effects on the historic properties in the inventory. AR10883. As to any properties of traditional religious and cultural importance on the inventory, the PA required BLM to consult the appropriate SHPO and affected tribe to develop avoidance measures. AR10883 (PA Stip. II.A.2.). But where avoidance is not possible, BLM was to consult with the affected tribes and SHPO regarding "possible measures to resolve the adverse effects and ensure that those measures are properly considered in the development of the HPTP." AR10883. Under the PA, BLM must ensure that all HPTP measures are carried out and may authorize construction where HPTP provisions have been implemented, or, where no historic properties are present, authorize construction prior to approval of the final HPTP. AR10887, -89.

Pursuant to the PA, SunZia prepared in September 2018 a draft HPTP to address "potential direct, indirect and cumulative effects from construction and reclamation as well as from operation and maintenance of the proposed transmission line and associated facilities." In September 2018 and submitted it for BLM review. AR7665; AR10883-86. In February 2019, SunZia prepared a revised HPTP. AR7135. BLM put its HPTP review on hold in 2020. AR6566. In June 2023, BLM provided the draft HPTP to the SHPOs and consulting parties for a 45-day review and comment period on the adequacy of the proposed treatment measures. AR2296; AR2445; AR2010; AR10886. BLM met with consulting parties to discuss the HPTP within the 45-day review period in accordance with

37

the PA, AR1734, and received comments, *see, e.g.*, AR1732; AR1704; AR1697; AR1688. SunZia then revised the HPTP based on comments. AR1490. AR10886. After ensuring all comments were taken into consideration in the final HPTP, BLM sent the revised HPTP to the consulting parties for a 21-day review period. AR1310; AR1490; AR10886. BLM consulted with the Arizona SHPO, which approved the final HPTP on September 29, 2023. AR10886; AR1016-18.

In the interim, however, BLM approved the September 2023 LNTP (and re-issued after a temporary suspension in November 2023). The LNTP at issue covered the portions of the San Pedro Valley where no historic properties were identified. BLM's decision to issue the LNTP was consistent with the PA. AR1028-29 (LNTP); AR10889. As explained above, the PA site inventory did not identify the entire San Pedro Valley as a TCP. The PA explicitly permitted issuance of an LNTP prior to completion of the HPTP in areas where no historic properties had been identified. Plaintiffs did not object to the inventory list on that basis or otherwise provide sufficient information to BLM during the PA's identification phase to suggest the Tribes viewed the entire San Pedro Valley was a potential TCP. And because BLM's approval of SunZia's right-of-way amendment did not propose any alterations to the approved transmission corridor in Arizona, nothing about BLM's PA obligations for those portions changed. AR6078; AR4908; AR2559.

By the time Plaintiffs Tribes, in early 2023, specifically asserted that the entire San Pedro Valley was a TCP, five years had passed since the Arizona SHPO concurred in the site inventory list, and BLM had completed nearly all the procedural steps in the PA. In March 2023, BLM indicated its intention to use Stipulation VI of the PA to conduct the identification and evaluation process for the San Pedro Valley as a potential TCP, continue with the HPTP and prepare an addendum HPTP. But BLM also emphasized that concrete input and information from the Tribes was necessary to complete the process. AR2546;

AR2743-44. BLM proceeded and completed the HPTP review and approval process, consistent with the PA in 2023.[12] AR1029.

Plaintiffs suggest that the PA prohibited BLM from issuing an LNTP before considering effects to known but "later-identified" historic properties. Pls.' Br. 38. That is not what the provision for later-identified historic properties says. Stipulation IV of the PA addresses the circumstances in which identification of a potential TCP occurs during the implementation of the Project. AR10889-90. Relevant here, "[i]f the discovered cultural resource is subsequently identified by an Indian tribe as a property of traditional religious and cultural importance, the BLM shall consult with the appropriate tribe(s)." AR10889. In those consultations, BLM would discuss the adverse effects on the TCP, and whether it would be possible to avoid those effects. If it is not possible to avoid, then BLM must consult the tribes about mitigation efforts. AR10883. Indeed, this case presents unusual circumstances where a TCP was purportedly known by one or more consulting parties but not raised during the extensive identification phase outlined in the PA. But despite not being identified during the extensive inventory phase, BLM has taken appropriate action consistently with the stipulations in the PA, including early attempts to consult with the Tribes. Though the Tribes' request to treat the entire San Pedro Valley as a TCP came late, BLM followed the PA process.

There is no dispute that the Tribes identified the entire San Pedro Valley well after the inventory list had been completed, and the SHPO had concurred. AR2942, -44; AR2932. BLM attempted to meet with Plaintiff Tribes to understand these newly raised concerns, but with no response. *See, e.g.*, AR2544; AR2443; AR1922; AR1730; AR1712;

---

[12] The LNTPs at issue here were not the only ones pertaining the San Pedro Valley. Plaintiffs' brief ignores the fact that there were cultural sites identified in the San Pedro Valley during the identification phase. BLM consulted with the tribes (including Plaintiff Tribes) and consultation resulted in an agreed-upon treatment plan, which was documented in the HPTP. BLM authorized construction for those portions of the Valley in accordance with the PA after finalization of the HPTP. AR10889; *see* *AR618-42 (LNTP for identified cultural sites in San Pedro Valley).

AR1518; AR1206; AR1204; AR1202; AR1190; AR1042-44; AR1033-34; AR1023. Despite no requirements to do so, BLM even withheld the LNTP to provide more time for discussion with the consulting parties. AR1209; AR885. Although Plaintiffs finally agreed to meet with BLM in November 2023, this meeting did not lead to the Tribes' production of additional information about the San Pedro Valley and further solidified Plaintiffs' objective as an effort to stop the Project. AR753. ACHP also raised the same questions as Plaintiffs at that point regarding BLM's compliance with the PA. AR788. But after considering the ACHP's questions and meeting with the ACHP, BLM determined that it had met all applicable requirements of the PA. AR744.

As Plaintiffs' correctly note, Pls.' Br. 34, the PA requires BLM to consult with tribes if a tribe has expressed concerns about effects on identified properties to which they ascribe traditional religious and cultural importance. AR10881. But "[c]onsultation is a two-way street. *San Carlos Apache*, 803 F. Supp. 3d at 942 (quoting *Concerned Citizens & Retired Miners Coalition v. Forest Serv.*, 279 F. Supp. 3d 898, 942 (D. Ariz. 2017)). And "the obligation to engage in consultation is not the same thing as an obligation to reach an outcome that is acceptable from the perspective of the party being consulted." *San Carlos Apache Tribe*, 803 F. Supp. 3d at 944. Not only did BLM make several attempts to consult with Plaintiff Tribes about their TCP claim, but BLM explained that it would comply with the PA moving forward. And, contrary to Plaintiffs' arguments, BLM did comply with the PA before (and after) it issued the LNTPs to SunZia.

BLM's efforts following the right-of-way amendment in 2023 further evidences a reasonable implementation of the PA's requirements. After Plaintiff Tribes sent letters in March 2023 suggesting—for the first time—that the San Pedro Valley should be considered a potential TCP, BLM endeavored to understand more about the San Pedro Valley and sought to schedule tribal consultation meetings. BLM reached out to the Tribes multiple times—first in April 2023, two more times in June 2023, and again in August 2023. *See* AR2543-44; AR1922; AR1730; AR1712; AR1518 (Aug. 22, 2023 BLM

40

Outreach); AR1206; AR1204; AR1202; AR1050; AR1042-44; AR1033-34; AR1023, -25; AR1048-49; AR1188-89; AR1190-91. But BLM received no response. To provide Plaintiff Tribes more time to respond, and despite the impacts to SunZia's stringent construction plans, BLM even withheld issuance of the LNTP for construction within San Pedro Valley on state and private lands in Arizona. Plaintiffs' suggestion that BLM "rushed" to issue the LNTP before consulting with the Tribes is simply not true. Pls.' Br. 35. The record, as explained above, establishes BLM complied with the PA and made a reasonable effort to consider the Tribes' new assertions. The record also shows BLM's approach to possibly address the potential TCP for the entire San Pedro Valley or discrete locations within the Valley, including with an addendum HPTP and treating the potential TCP as under the discovery provisions in the PA. *See* AR1188, AR1031-32, AR751.

      **6.    Neither the NHPA nor the Project-specific PA require "avoidance" of TCPs.**

Plaintiffs also incorrectly suggest the PA process provides a means for BLM, as a form of avoiding of adverse effects, to reconsider its 2015 decision and move the 50-mile segment of the transmission line out of the San Pedro Valley. Pls.' Br. 34-35. But that is not a form of "avoidance" contemplated under the PA.

As a primary matter, Plaintiffs focus on avoidance conflicts with what they argued before the Ninth Circuit. *Tohono O'odham Nation*, 138 F.4th at 1199 ("Plaintiffs have clarified that they do not seek to force the Project to avoid the entire San Pedro Valley."). In any event, there are at least three reasons why BLM did not act contrary to the PA by not considering a reroute of the line out of San Pedro Valley before issuing the LNTP.

First, despite Plaintiffs' reading, the PA does not "clearly establish[ ] avoidance as the preferred method." Pls.' Br. 34. Rather, the PA provides that BLM shall, *if possible*, avoid adverse effects to all historic properties with input from the consulting parties. AR10883. The PA provides some examples of potential "avoidance measures" that *may* be appropriate for cultural resources—one being the "realignment of the transmission line."

AR10883. Avoidance serves as a potential adjustment or even realignment of construction facilities to avoid physical (or even non-physical) effects. AR10881. But when avoidance is not possible, the PA instructs that BLM must minimize or mitigate adverse effects to historic properties. AR10883. This is also consistent with the NHPA because it is a procedural statute and does "not require [a federal agency] to engage in any particular preservation activities[.]" *CTIA-Wireless Ass'n v. F.C.C.*, 466 F.3d 105, 106-07 (D.C. Cir. 2006) (citation modified); *see San Carlos Apache*, 417 F.3d at 1097; *Standing Rock Sioux Tribe*, 205 F. Supp. 3d at 32.

Second, Plaintiffs misunderstand the context of the PA's use of the phrase "realignment." Pls.' Br. 35-36. "Avoidance," as used in that context in the PA, is limited to "minor adjustments to design or construction location." AR757. Even assuming all parties had accepted that the San Pedro Valley was a TCP before the 2015 routing decision, the PA would still not offer reconsideration of that routing decision as a form of avoidance. "Realignment" could not mean what Plaintiffs want it to mean. Pls.' Br. 35-36.

This is why BLM articulated that "the [PA] does not offer the parties re-routing as a resolution or avoidance measure" because "BLM does not have the ability to reconsider the 2015 approval of the transmission line, especially for a segment of the transmission line that is on non-federal land and therefore outside of BLM's direct jurisdiction." AR754.[13] Plaintiffs' assertion that in 2013 (i.e., pre-PA implementation) BLM "signaled to consulting parties that the PA process would be the *only* vehicle for assessing methods to avoid effects" including "major reroutes" is wrong. Pls.' Br. 39 (citing AR11035). The record shows that BLM has never offered that the PA would allow for anything more than a minor realignment. *See* AR11035 (explaining BLM is not in a position to reroute based

---

[13] BLM's explanation of the phrase "avoidance" in the PA is not a post hoc rationalization. *See* Pls.' Br. 35. Plaintiffs maintain that the November 27, 2023 LNTP is final agency action, *see id.* at 27. Thus, BLM's response letter dated November 24, 2023 is not a "post-decisional letter." Pls.' Br. 35; *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (agency cannot rely on "post-hoc rationalizations" to defend its earlier decision).

42

on the Class I and II inventories because selected route had not been selected yet). In fact, in 2015, BLM expressed that "[m]inor realignments and pole placements are standard techniques for achieving avoidance and minimization" as detailed in the forthcoming PA. AR10864 (BLM 2015 Protest Resolution Report); *see also* AR7687 (BLM response to Tohono O'odham's comment requesting adjusting ROW to avoid sites). Despite Plaintiffs' argument to the contrary, they knew or should have known that the PA did not offer an opportunity to reconsider the location of the transmission line through the San Pedro Valley. *See* Pls.' Br. 27.

Third, even if reroute were an option under the PA (it is not), BLM did not act contrary to the facts before it in refusing to consider a reroute given the stage of development. Plaintiffs are asking that BLM require SunZia to reroute a 50-mile segment of a 500-mile project, for which the route was chosen in 2015, and based on information that was available to the Tribes well before 2015, not to mention during the extensive identification process to which they were participants.

### 7.    BLM reasonably authorized construction prior to finalizing the HPTP addendum.

Plaintiffs next argue that BLM is in "ongoing violation" of the NHPA and PA by authorizing construction before completing an HPTP addressing adverse effects on TCPs. Pls.' Br. 40-42. This argument also fails.

The PA and HPTP provide an ongoing process for identifying cultural resources and treatment measures to avoid, minimize, and mitigate effects to any cultural resources. Plaintiff Tribes and ASW participated in the HPTP development process. As a reminder, per the PA, the HPTP was developed to address those effects to properties identified in the inventory phase. AR10883-86 (PA); *see also* AR111. Yet before the Arizona HPTP was finalized, Plaintiff Tribes and ASW raised concerns about the San Pedro Valley TCP in 2023. Thus, BLM reasonable explained that given the delayed timing for providing this

43

information, BLM would evaluate and consider San Pedro Valley as a TCP in a second treatment plan after completing the first Arizona HPTP. *See* AR869-70.

BLM also acted reasonably and consistently with the PA by finalizing the second HPTP after issuing the LNTP. Given the late identification, BLM reasonably explained that:

> BLM believes it is appropriate to continue the process of evaluating San Pedro Valley as a potential traditional cultural property (TCP) through consultation; however, the BLM has determined that the timing of the information provided by the Tribes relative to the many years the consulting parties worked toward completing the steps of the PA process and a treatment plan does not support pausing portions of the Project until BLM evaluates and considers an amendment or addendum to the treatment plan to cover San Pedro Valley.

AR742-43 (November 27 LNTP). As, according to the PA, the only available option to address the non-physical effects is to consider and discuss mitigation measures. AR10883 (PA). The record shows that BLM continued to consult with the tribes and consulting parties to develop the second HPTP addressing the non-physical effects in the Arizona portion of the Project. AR139-40. Plaintiffs provided no information or response to BLM's attempt to consult after several meetings in late 2023 and early 2024. *See, e.g.*, AR565-69 (Jan. 2024 meeting notes) (explaining BLM needs tribal input to identify cultural landscapes). And BLM continuously explained that the transmission line would not move out of the San Pedro Valley, but that it would continue to consult the tribes to determine appropriate mitigation measures. AR567.

**B.     Portions, if not all, of Plaintiffs' case is likely moot and any remedy that could be available would be limited to further consultations.**

Plaintiffs' request for vacatur of the LNTPs authorizing construction through the San Pedro Valley is misplaced. Pls.' Br. 45. Plaintiffs' Complaint seeks an order vacating the September 28, 2023 LNTP and November 27, 2023 LNTPs and underlying right-of-way authorization for the Project in the middle and lower San Pedro Valley; and enjoining BLM from authorizing construction activities in the San Pedro Valley pending the

completion of a legally adequate Section 106 process. Compl. at 63. Our understanding from Defendant-Intervenor is that construction in the relevant portion of the San Pedro Valley is complete. If construction is complete, then an injunction against construction is meaningless. And an order vacating the LNTPs would also be meaningless because, as explained above, the LNTP does not (and did not) authorize the Project. It simply signaled that SunZia could begin construction on the right-of-way BLM issued in 2016.

Moreover, courts are not mechanically "required to set aside every unlawful agency action." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995). So "[e]ven if an [agency's analysis] falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project[.]" *Seven Cnty. Infrastructure Coalition v. Eagle Cnty.*, 605 U.S 168, 185 (2025); *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1992). The party seeking vacatur must show entitlement to such relief. *Monsanto v. Geerton Seed Farms*, 561 U.S. 139, 156-57 (2010). As explained above, BLM's LNTPs should be upheld. But a remedy—if any—will be informed by the Court's decision on the merits. Should the Court decide in Plaintiffs' favor on any issue, Federal Defendants request supplementary remedy briefing so the Court can properly weigh the appropriate factors. *Espy*, 45 F.3d at 1343.

And to the extent that Plaintiffs are articulating a harm from the continued presence of the transmission line in their TCP, that injury would still remain. And vacatur of the LNTP would not address that injury. For any harm associated with the presence of the line, the only remedy would be remand to BLM for further consultation. *See Ariz. Mining*, 172 F.4th at 663-64 (Section 106 "does not mandate any particular substantive outcome from the consultation process"); *CTIA-Wireless Ass'n*, 466 F.3d at 106-07.

## VI.    CONCLUSION

For all these reasons, Federal Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment and grant summary judgment for Federal Defendants.

Dated: May 15, 2026                    Respectfully submitted,

                                        ADAM R.F. GUSTAFSON
                                        Principal Deputy Assistant Attorney General


                                        */s/ Amber Dutton-Bynum*
                                        AMBER DUTTON-BYNUM
                                        United States Department of Justice
                                        Environment & Natural Resources Division
                                        Natural Resources Section
                                        P.O. Box 7611
                                        Washington, DC 20044-7611
                                        Tel: (202) 330-2649
                                        Amber.Dutton-Bynum@usdoj.gov

                                        DEVON LEHMAN MCCUNE
                                        United States Department of Justice
                                        Environment & Natural Resources Division
                                        Natural Resources Section
                                        999 18th St., S. Terrace, Suite 370
                                        Denver, CO 80026
                                        Tel: (303) 844-1487
                                        Devon.McCune@usdoj.gov

                                        *Counsel for the United States*

# CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2026, I filed this document electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

/s/ Amber Dutton-Bynum
AMBER DUTTON-BYNUM
U.S. Department of Justice

47